[No. S044053. Oct. 12, 1995.]

JOHN DELLA PENNA, Plaintiff and Appellant, v.
TOYOTA MOTOR SALES, U.S.A., INC., Defendant and Respondent.

**COUNSEL**

Korda, Johnson & Wall, Michael J. Korda and J. Joseph Wall, Jr., for Plaintiff and Appellant.

William A. Plourde, Jr., David D. Laufer, Gibson, Dunn & Crutcher, Paul G. Bower, Daniel G. Swanson, J. Andrew Chang and John A. Arguelles for Defendant and Respondent.

Horvitz & Levy, David M. Axelrad, Lisa Perrochet, Downey, Brand, Seymour & Rohwer and J. Keith McKeag as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**ARABIAN, J.**—We granted review to reexamine, in light of divergent rulings from the Court of Appeal and a doctrinal evolution among other state high courts, the elements of the tort variously known as interference with "prospective economic advantage," "prospective contractual relations," or "prospective economic relations," and the allocation of the burdens of proof between the parties to such an action. We conclude that those Court of Appeal opinions requiring proof of a so-called "wrongful act" as a component of the cause of action, and allocating the burden of proving it to the plaintiff, are the better reasoned decisions; we accordingly adopt that analysis as our own, disapproving language in prior opinions of this court to the contrary. Such a requirement, incorporating the views of several other jurisdictions, much of the Restatement Second of Torts, the better reasoned decisions of the Court of Appeal, and the views of leading academic authorities, sensibly redresses the balance between providing a remedy for predatory economic behavior and keeping legitimate business competition outside litigative bounds. We do not in this case, however, go beyond approving the requirement of a showing of wrongfulness as part of the plaintiff's case; the case, if any, to be made for adopting refinements to that element of the tort—requiring the plaintiff to prove, for example, that the defendant's conduct amounted to an independently tortious act, or was a species of anticompetitive behavior proscribed by positive law, or was motivated by unalloyed malice—can be considered on another day, and in another case.

In this case, after the trial court modified the standard jury instruction to require the plaintiff automobile dealer to show that defendant Toyota's interference with his business relationships was "wrongful," the jury returned a verdict for Toyota. The Court of Appeal reversed the ensuing judgment and ordered a new trial on the ground that plaintiff's burden of proof did not encompass proof of a "wrongful" act and that the modified jury instruction was therefore erroneous. Given our conclusion that the plaintiff's

burden *does* include proof that the defendant's conduct was wrongful by some measure other than an interference with the plaintiff's interest itself, we now reverse the Court of Appeal and direct that the judgment of the trial court be affirmed.

## I

John Della Penna, an automobile wholesaler doing business as Pacific Motors, brought this action for damages against defendant Toyota Motor Sales, U.S.A., Inc., and its Lexus division, alleging that certain business conduct of defendants both violated provisions of the Cartwright Act, California's state antitrust statute (Bus. & Prof. Code, § 16700 et seq.), and constituted an intentional interference with his economic relations. The impetus for Della Penna's suit arose out of the 1989 introduction into the American luxury car market of Toyota's Lexus automobile. Prior to introducing the Lexus, the evidence at trial showed, both the manufacturer, Toyota Motor Corporation, and defendant, the American distributor, had been concerned about the possibility that a resale market might develop for the Lexus in Japan. Even though the car was manufactured in Japan, Toyota's marketing strategy was to bar the vehicle's sale on the Japanese domestic market until after the American rollout; even then, sales in Japan would only be under a different brand name, the "Celsior." Fearing that auto wholesalers in the United States might reexport Lexus models back to Japan for resale, and concerned that, with production and the availability of Lexus models in the American market limited, reexports would jeopardize its fledgling network of American Lexus dealers, Toyota inserted in its dealership agreements a "no export" clause, providing that the dealer was "authorized to sell [Lexus automobiles] only to customers located in the United States. [Dealer] agrees that it will not sell [Lexus automobiles] for resale or use outside the United States. [Dealer] agrees to abide by any export policy established by [distributor]."

Following introduction into the American market, it soon became apparent that some domestic Lexus units were being diverted for foreign sales, principally to Japan. To counter this effect, Toyota managers wrote to their retail dealers, reminding them of the "no-export" policy and explaining that exports for foreign resale could jeopardize the supply of Lexus automobiles available for the United States market. In addition, Toyota compiled a list of "offenders"—dealers and others believed by Toyota to be involved heavily in the developing Lexus foreign resale market—which it distributed to Lexus dealers in the United States. American Lexus dealers were also warned that doing business with those whose names appeared on the "offenders" list might lead to a series of graduated sanctions, from reducing

a dealer's allocation to possible reevaluation of the dealer's franchise agreement.

During the years 1989 and 1990, plaintiff Della Penna did a profitable business as an auto wholesaler purchasing Lexus automobiles, chiefly from the Lexus of Stevens Creek retail outlet, at near retail price and exporting them to Japan for resale. By late 1990, however, plaintiff's sources began to dry up, primarily as a result of the "offenders list." Stevens Creek ceased selling models to plaintiff; gradually other sources declined to sell to him as well.

In February 1991, plaintiff filed this lawsuit against Toyota Motor Sales, U.S.A., Inc., alleging both state antitrust claims under the Cartwright Act and interference with his economic relationship with Lexus retail dealers. At the close of plaintiff's case-in-chief, the trial court granted Toyota's motion for nonsuit with respect to the remaining Cartwright Act claim (plaintiff had previously abandoned a related claim—unfair competition—prior to trial). The tort cause of action went to the jury, however, under the standard BAJI instructions applicable to such claims with one significant exception. At the request of defendant and over plaintiff's objection, the trial judge modified BAJI No. 7.82—the basic instruction identifying the elements of the tort and indicating the burden of proof—to require plaintiff to prove that defendant's alleged interfering conduct was "wrongful."[1]

The jury returned a divided verdict, nine to three, in favor of Toyota. After Della Penna's motion for a new trial was denied, he appealed. In an unpublished disposition, the Court of Appeal unanimously reversed the trial court's judgment, ruling that a plaintiff alleging intentional interference with economic relations is not required to establish "wrongfulness" as an element of its prima facie case, and that it was prejudicial error for the trial court to have read the jury an amended instruction to that effect. The Court of Appeal remanded the case to the trial court for a new trial; we then granted Toyota's petition for review and now reverse.

---

[1] The standard instruction governing "intentional interference with prospective economic advantage," BAJI No. 7.82, describes the essential elements of the claim as (1) an economic relationship between the plaintiff and another, "containing a probable future economic benefit or advantage to plaintiff," (2) defendant's knowledge of the existence of the relationship, (3) that defendant "intentionally engaged in acts or conduct designed to interfere with or disrupt" the relationship, (4) actual disruption, and (5) damage to the plaintiff as a result of defendant's acts. The modification sought by defendant and adopted by the trial court consisted in adding the word "wrongful" in element (3) between the words "in" and "acts." The trial court also read to the jury *plaintiff's* special jury instruction defining the "wrongful acts" required to support liability as conduct "outside the realm of legitimate business transactions . . . . Wrongfulness may lie in the method used or by virtue of an improper motive."

## II

### A

Although legal historians have traced the origins of the so-called "interference torts" as far back as the Roman law, the proximate historical impetus for their modern development lay in mid-19th century English common law. (See, e.g., Sayre, *Inducing Breach of Contract* (1923) 36 Harv. L.Rev. 663; Note, *Tortious Interference With Contractual Relations in the Nineteenth Century: The Transformation of Property, Contract, and Tort* (1980) 93 Harv. L.Rev. 1510.) The opinion of the Queen's Bench in *Lumley* v. *Gye* (1853) 2 El. & Bl. 216 [118 Eng.Rep. 749], a case that has become a standard in torts casebooks, is widely cited as the origin of the two torts —interference with contract and its sibling, interference with prospective economic relations[2]—in the form in which they have come down to us. The plaintiff owned the Queen's Theatre, at which operas were presented. He contracted for the services of a soprano, Johanna Wagner, to perform in various entertainments between April 15 and July 15, with the stipulation that Miss Wagner would not perform elsewhere during that time without his permission.

In an action on the case, the theater owner alleged that Gye, the owner of a rival theater, knowing of the Wagner-Lumley agreement, "maliciously" interfered with the contract by "enticing" Wagner to abandon her agreement with Lumley and appear at Gye's theater. Gye's demurrer to the complaint was overruled by the trial court, a ruling that was affirmed by the justices of the Queen's Bench on the then somewhat novel grounds that (1) "enticing" someone to leave his or her employment was not limited to disrupting the relationship between master and servant but applied to a "dramatic artiste" such as Miss Wagner, and (2) "wrongfully and maliciously, or, which is the same thing, with notice, interrupt[ing]" a personal service contract, regardless of the means the defendant employed, was an actionable wrong. (2 El. & Bl. at p. 224, per Crompton, J.)

The opinion in *Lumley* v. *Gye, supra,* 2 El. & Bl. 216 dealt, of course, with conduct intended to induce the *breach* of an *existing* contract, not conduct intended to prevent or persuade others *not to contract* with the plaintiff. That such an interference with *prospective* economic relations might itself be tortious was confirmed by the Queen's Bench over the next 40 years. In

---

[2]Throughout this opinion, in an effort to avoid both cumbersome locutions and clumsy acronyms ("IIPEA"), we use the phrase "interference with economic relations" to refer to the tort generally known as "intentional interference with prospective contractual or economic relations" and to distinguish it from the cognate form, "intentional interference with *contract*."

*Temperton* v. *Russell* (1893) 1 Q.B. 715 (*Temperton*), a labor union, embroiled in a dispute with a firm of builders, announced what today would be called a secondary boycott, intended to force a resolution of the union's grievances by pressuring suppliers of the builder to cease furnishing him construction materials. A failure to comply with the union's boycott demands, suppliers were warned, would result in union pressure on those who bought *their* supplies not to deal with *them*.

One such supplier of the builder, Temperton, sued the union's leadership, alleging that his business had been injured by breaches of supply contracts and the refusal of others to do business with him, all as a result of the union's threats. A unanimous Queen's Bench upheld the jury's verdict for the plaintiff, reasoning in part on the authority of *Lumley* v. *Gye, supra,* 2 El. & Bl. 216, that in the words of Lord Esher, the Master of the Rolls, "the distinction . . . between the claim for inducing persons to break contracts already entered into . . . and . . . inducing persons not to enter into contracts . . . can[not] prevail." (*Temperton, supra,* 1 Q.B. at p. 728.)

"There was the same wrongful intent in both cases, wrongful because malicious," Lord Esher wrote. "There was the same kind of injury to the plaintiff. It seems rather a fine distinction to say that, where a defendant maliciously induces a person not to carry out a contract already made with the plaintiff and so injures the plaintiff, it is actionable, but where he injures the plaintiff by maliciously preventing a person from entering into a contract with the plaintiff, which he would otherwise have entered into, it is not actionable." (*Temperton, supra,* 1 Q.B. at p. 728.)

As a number of courts and commentators have observed, the keystone of the liability imposed in *Lumley* v. *Gye, supra,* 2 El. & Bl. 216, and *Temperton, supra,* 1 Q.B. 715, to judge from the opinions of the justices, appears to have been the "malicious" intent of a defendant in enticing an employee to breach her contract with the plaintiff, and in damaging the business of one who refused to cooperate with the union in achieving its bargaining aims. While some have doubted whether the use of the word "malicious" amounted to anything more than an intent to commit an act, knowing it would harm the plaintiff (see, e.g., Dobbs, *Tortious Interference With Contractual Relationships* (1980) 34 Ark. L.Rev. 335, 347, fn. 37), Dean Keeton, assessing the state of the tort as late as 1984, remarked that "[w]ith intent to interfere as the usual basis of the action, the cases have turned almost entirely upon the defendant's motive or purpose and the means by which he has sought to accomplish it. As in the cases of interference with contract, any manner of intentional invasion of the plaintiff's interests may

be sufficient if the purpose is not a proper one." (Prosser & Keeton on Torts (5th ed. 1984) Interference with Prospective Advantage, § 130, p. 1009.)

It was, legal historians have suggested, this early accent on the defendant's "intentionality" that was responsible for allying the interference torts with their remote relatives, intentional torts of a quite different order—battery, for example, or false imprisonment. More than one account of the rise of the tort has relied on Lord Bowen's statement in an interference with contract case that "intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that person's property or trade, is actionable if done without just cause or excuse." (*Mogul Steamship Co.* v. *McGregor, Gow & Co.* (1889) 23 Q.B.D. 598, 613.)

One consequence of this superficial kinship was the assimilation to the interference torts of the pleading and burden of proof requirements of the "true" intentional torts: the requirement that the plaintiff need only allege a so-called "prima facie tort" by showing the defendant's awareness of the economic relation, a deliberate interference with it, and the plaintiff's resulting injury. (See, e.g., Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle* (1959) 54 Nw. U. L.Rev. 563; Note, *The Prima Facie Tort Doctrine* (1952) 52 Colum. L.Rev. 503.[3]) By this account of the matter—the traditional view of the torts and the one adopted by the first Restatement of Torts—the burden then passed to the defendant to demonstrate that its conduct was *privileged*, that is, "justified" by a recognized defense such as the protection of others or, more likely in this context, the defendant's own competitive business interests. (See, e.g., Restatement, Torts (1939) § 766, coms. b-m, pp. 50-63; *A.F. Arnold & Co.* v. *Pacific Professional Ins., Inc.* (1972) 27 Cal.App.3d 710, 715 [104 Cal.Rptr. 96]; *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 19 [144 Cal.Rptr. 664, 6 A.L.R.4th 184].)

These and related features of the economic relations tort and the requirements surrounding its proof and defense led, however, to calls for a reexamination and reform as early as the 1920's. Tracing the origins and the current

---

[3]A century or so ago, the notion of the "prima facie tort" was regarded by the leading legal authorities of the day as a principle vital to the reconstitution of the jurisprudence of civil wrongs in the aftermath of the disintegration of the old common law forms of action. Competing formulations of "intentionality," as an aspect of the prima facie wrong, were offered by such luminaries of their day as Dean Pound (see 3 Pound Jurisprudence (1959) p. 9), and by Justice Holmes. (See *Aikens* v. *Wisconsin* (1904) 195 U.S. 194, 204 [49 L.Ed. 154, 159, 25 S.Ct. 3] ["It has been considered that, *prima facie*, the intentional infliction of temporal damages is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading, requires a justification if the defendant is to escape."].)

status of the two interference torts in 1923, Francis Sayre concluded that "a somewhat uncertain law has resulted. [¶] . . . . [¶] . . . . Courts still punctiliously repeat the well-known formula which requires 'malice,' or 'without just cause' . . . as one of the requirements of the tort; but there has been such a lack of agreement as to what constitutes 'malice' or 'absence of justification' that such words are becoming little more than empty phrases . . . . Is it not time to formulate the problem of what these worn phrases mean?" (Sayre, *Inducing Breach of Contract*, *supra*, 36 Harv. L.Rev. at pp. 672, 674-675, fn. omitted.) The nature of the wrong itself seemed to many unduly vague, inviting suit and hampering the presentation of coherent defenses. More critically in the view of others, the procedural effects of applying the prima facie tort principle to what is essentially a business context led to even more untoward consequences.

Because the plaintiff's initial burden of proof was such a slender one, amounting to no more than showing the defendant's conscious act and plaintiff's economic injury, critics argued that legitimate business competition could lead to time consuming and expensive lawsuits (not to speak of potential liability) by a rival, based on conduct that was regarded by the commercial world as both commonplace and appropriate. The "black letter" rules of the Restatement of Torts surrounding the elements and proof of the tort, some complained, might even suggest to "foreign lawyers reading the Restatement as an original matter [that] the whole competitive order of American industry is prima facie illegal." (Statement of Professor Carl Auerbach at ALI Proceedings, quoted in Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine* (1982) 49 U. Chi. L.Rev. 61, 79, fn. 89; see also Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law* (1993) 77 Minn. L.Rev. 1097, 1122 ["In an economic system founded upon the principle of free competition, competitors should not be liable in tort for seeking a legitimate business advantage."].)

Calls for a reformulation of both the elements and the means of establishing the economic relations tort reached a height around the time the Restatement Second of Torts was being prepared for publication and are reflected in its departures from its predecessor's version. Acknowledging criticism, the American Law Institute discarded the prima facie tort requirement of the first Restatement. A new provision, section 766B, required that the defendant's conduct be "improper," and adopted a multifactor "balancing" approach, identifying seven factors for the trier of fact to weigh in determining a defendant's liability. The Restatement Second of Torts, however, declined to take a position on the issue of which of the parties bore the burden of

proof, relying on the "considerable disagreement on who has the burden of pleading and proving certain matters" and the observation that "the law in this area has not fully congealed but is still in a formative stage." (See Rest.2d Torts (1965 ed.) Introductory Note, ch. 37, pp. 5-6.) In addition, the Restatement Second provided that a defendant might escape liability by showing that his conduct was justifiable and did *not* include the use of "wrongful means." (*Id.*, §§ 768-771.)

## B

In the meantime, however, an increasing number of state high courts had traveled well beyond the Restatement Second's reforms by redefining and otherwise recasting the elements of the economic relations tort and the burdens surrounding its proof and defenses. In *Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co.* (1978) 283 Or. 201 [582 P.2d 1365] (*Top Service*), the Oregon Supreme Court, assessing this " 'most fluid and rapidly growing tort,' " noted that "efforts to consolidate both recognized and unsettled lines of development into a general theory of 'tortious interference' have brought to the surface the difficulties of defining the elements of so general a tort without sweeping within its terms a wide variety of socially very different conduct." (*Id.* at p. 1368, fn. omitted.)

Recognizing the force of these criticisms, the court went on to hold in *Top Service, supra,* 582 P.2d 1365, that a claim of interference with economic relations "is made out when interference resulting in injury to another is *wrongful by some measure beyond the fact of the interference itself.* Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession. No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue *only if the acts charged would be tortious on the part of an unprivileged defendant.*" (*Id.* at p. 1371, italics added, fn. omitted.)

Four years later, the views of the Oregon Supreme Court in *Top Service, supra,* 582 P.2d 1365, were adopted by the Utah Supreme Court. In *Leigh Furniture and Carpet Co.* v. *Isom* (Utah 1982) 657 P.2d 293, that court underlined the same concerns that had moved the Oregon Supreme Court in *Top Service*: "The problem with the prima facie tort approach is that basing liability on a mere showing that defendant intentionally interfered with plaintiff's prospective economic relations makes actionable all sorts of contemporary examples of otherwise legitimate persuasion, such as efforts to

persuade others not to . . . engage in certain activities, or deal with certain entities. The major issue in the controversy—justification for the defendant's conduct—is left to be resolved on the affirmative defense of privilege. In short, the prima facie approach to the tort of interference with prospective economic relations requires too little of the plaintiff." (*Id.* at p. 303.)

The Utah Supreme Court went on, however, to reject the alternative, multifactor approach adopted by the Restatement Second: "We concur in the *Restatement (Second)*'s rejection of the prima facie tort approach because it leaves too much uncertainty about the requirements for a recognized privilege and the defendant's burden of pleading and proving these and other matters. [Citation.]. But we also reject the *Restatement (Second)*'s definition of the tort because of its complexity. We seek a better alternative." (657 P.2d at p. 304.) That alternative, the court concluded, was the one advanced by the Oregon Supreme Court in *Top Service, supra,* 582 P.2d 1365, a "middle ground" that requires "the plaintiff to allege and prove more than the prima facie tort, but not to negate all defenses of privilege." (657 P.2d at p. 304; see also *Pleas* v. *City of Seattle* (1989) 112 Wn.2d 794 [774 P.2d 1158, 1161-1163 [same]; *Duggin* v. *Adams* (1987) 234 Va. 221 [360 S.E.2d 832, 836-837] [also adopting *Top Service* requirements].)

Over the past decade or so, close to a majority of the high courts of American jurisdictions have imported into the economic relations tort variations on the *Top Service* line of reasoning, explicitly approving a rule that requires the plaintiff in such a suit to plead and prove the alleged interference was either "wrongful," "improper," "illegal," "independently tortious" or some variant on these formulations. Among others, the high courts of New Mexico (*Anderson* v. *Dairyland Ins. Co.* (1981) 97 N.M. 155 [637 P.2d 837, 840-841] ["wrongful means"]), Rhode Island (*Federal Auto Body Works* v. *Aetna Cas. & Sur.* (R.I. 1982) 447 A.2d 377, 379-380 ["improper"]), Connecticut (*Blake* v. *Levy* (1983) 191 Conn. 257 [464 A.2d 52, 54-55] ["in fact tortious"]), New Hampshire (*Montrone* v. *Maxfield* (1982) 122 N.H. 724 [449 A.2d 1216, 1217] ["wrongfully"]), Iowa (*Harsha* v. *State Sav. Bank* (Iowa 1984) 346 N.W.2d 791, 799-800 [52 A.L.R.4th 805] ["improper means" (*semble*)]), Arizona (*Wagenseller* v. *Scottsdale Memorial Hosp.* (1985) 147 Ariz. 370 [710 P.2d 1025, 1041-1043] ["improper" interference]), Kansas (*Turner* v. *Halliburton Co.* (1986) 240 Kan. 1 [722 P.2d 1106, 1115] ["intentional misconduct"]), Oklahoma (*Krebsbach* v. *Henley* (Okla. 1986) 725 P.2d 852, 856-858 ["unlawful or unjustified"]), Virginia (*Duggin* v. *Adams, supra,* 360 S.E.2d 832, 836 ["illegal or independently tortious" methods]), Kentucky (*Nat. Coll. Athletic Ass'n* v. *Hornung* (Ky. 1988) 754 S.W.2d 855, 859 ["malice or some significantly wrongful conduct"]), New

Jersey (*Printing Mart* v. *Sharp Electronics.* (1989) 116 N.J. 739 [563 A.2d 31, 39] ["wrongfully without justification"]), Washington (*Pleas* v. *City of Seattle, supra,* 774 P.2d 1158, 1161-1163 ["wrongful means"]), Colorado (*Westfield Dev.* v. *Rifle Inv. Assoc.* (Colo. 1990) 786 P.2d 1112, 1117-1118 ["improper"]), Massachusetts (*United Truck Leasing Corp.* v. *Geltman* (1990) 406 Mass. 811 [551 N.E.2d 20, 21-23] ["improperly"]), Wyoming (*Four Nines Gold, Inc.* v. *71 Const., Inc.* (Wyo. 1991) 809 P.2d 236, 238 ["improper" interference]), Idaho (*Idaho First Nat. Bank* v. *Bliss Valley Foods* (1991) 121 Idaho 266 [824 P.2d 841, 861] [" 'wrongful by some measure beyond the fact of the interference itself' "]), Maryland (*Macklin* v. *Logan* (1994) 334 Md. 287 [639 A.2d 112, 119] ["improper or wrongful conduct"]), Maine (*Devine* v. *Roche Biomedical Lab., Inc.* (Me. 1994) 637 A.2d 441, 447 ["fraud or intimidation"]), Montana (*State Bd. of Dentistry* v. *Kandarian* (1994) 268 Mont. 408 [886 P.2d 954, 959] ["a wrongful act"]), and Georgia (*U.S. Anchor Mfg.* v. *Rule Industries* (1994) 264 Ga. 295 [443 S.E.2d 833, 836] ["some . . . *unlawful* element"]) have adopted one or another of these variations.

III

In California, the development of the economic relations tort has paralleled its evolution in other jurisdictions. For many years this court declined to adopt the holding of *Lumley* v. *Gye, supra,* 2 El. & Bl. 216, on the ground that, as we reasoned in *Boyson* v. *Thorn* (1893) 98 Cal. 578 [33 P. 492], "[i]t is a truism of the law that an act which does not amount to a legal injury cannot be actionable because it is done with a bad intent . . . . If it is right, and the *means* used to procure the breach are right, the motive cannot make it a wrong . . . ." (*Id.* at pp. 583-584, italics in original.) In *Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33 [112 P.2d 631], however, a unanimous court, speaking through Justice Traynor, pronounced these statements in *Boyson* "not necessary to the decision" and directed that they be "disregarded." (*Id.* at p. 38.) California thus joined the majority of jurisdictions in adopting the view of the first Restatement of Torts by stating that "an action will lie for *unjustifiably* inducing a breach of contract." (*Id.* at p. 39, italics added.)

In the aftermath of *Imperial Ice Co.* v. *Rossier, supra,* 18 Cal.2d 33, our early economic relations cases were principally of two types, either the classic master and servant pattern of the pre-*Lumley* v. *Gye* cases (see, e.g., *Buxbom* v. *Smith* (1944) 23 Cal.2d 535, 548 [145 P.2d 305] [hiring away of plaintiff's employees by defendant after plaintiff had built up his business to distribute defendant's publication and defendant had breached distribution contract held actionable as "an unfair method of interference with advantageous relations"]) or those involving circumscribed kinds of business relations in which the plaintiff, typically a real estate broker or attorney working

on a contingency, sued to recover fees after defendant had refused to share property sales proceeds or a personal injury recovery (see, e.g., *Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815 [122 Cal.Rptr. 745, 537 P.2d 865] (*Buckaloo*) [defendant refused to pay plaintiff his broker's commission on the sale of beach property after plaintiff had discussed sale with buyers and directed them to defendant; *held*, the complaint stated a claim for relief for intentional interference with prospective economic relations].)

California cases thus reflected the historical origins and development of the tort, especially as it stood prior to the revisions of the Restatement Second and the concurrent evolution in the case law. In *Zimmerman* v. *Bank of America* (1961) 191 Cal.App.2d 55 [12 Cal.Rptr. 319], for example, the plaintiff real estate agent alleged that the defendant bank had "maliciously" induced third parties to breach an oral agreement with him to broker the sale of their property. In holding that the statute of frauds did not bar the plaintiff's interference claim, the Court of Appeal discussed the relationship between the two interference torts. Writing for the court, Justice Tobriner both aligned the source of the economic relations tort with its contractual sibling and employed language that bears a striking symmetry with Lord Esher's statement in *Temperton, supra*, 1 Q.B. 715, 728: "The history of the tort," he wrote, "discloses its essence. It contemplates, basically, a disruption of a relationship, not necessarily the breach of a contract. . . . [¶] . . . [¶] . . . We cannot conceive how the action for interference with an existing lawful contract, even though unenforceable, could occupy a status lower than that of interference with negotiations contemplating a contract. If interference with the negotiations constitutes the tort, interference with the contract in which the negotiations fructify must necessarily constitute the tort." (*Zimmerman, supra*, 191 Cal.App.2d at pp. 57, 60.)

This court endorsed the reasoning of *Zimmerman* v. *Bank of America, supra*, 191 Cal.App.2d 55, in *Buckaloo, supra*, 14 Cal.3d at p. 822, a case in which the plaintiff sued the seller and buyers of beachfront property to recover damages for the loss of his commission from the sale of the land. Among other claims, plaintiff alleged that defendants had intentionally interfered with an expectancy arising out of the seller's open invitation to brokers and his preliminary discussions regarding the sale of the property with the buyers. Upholding the allegations of the complaint as sufficient to survive a demurrer, we characterized the economic relations tort as one "infrequently invoked" but a "more inclusive wrong" than its relative, intentional interference with contract. (*Id.* at pp. 822-823.)

Our opinion in *Buckaloo, supra*, 14 Cal.3d 815, reviewed a number of Court of Appeal decisions upholding the applicability of the tort to real

estate brokerage situations (*id.* at pp. 823-826) and concluded by identifying the following elements of the cause of action. "In a real estate brokerage context these are: (1) an economic relationship between broker and vendor or broker and vendee containing the probability of future economic benefit to the broker, (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, (4) actual disruption of the relationship, (5) damages to the plaintiff proximately caused by the acts of the defendant." (*Id.* at p. 827.)

"In California," we went on to observe, "privilege or justification is an affirmative defense, and the lack thereof need not be shown by the original pleader." (14 Cal.3d at pp. 827-828.) A note of caution, however, crept into our formulation of principles at this point. "Perhaps the most significant privilege or justification for interference with a prospective business advantage is free competition," we wrote, "Ours is a competitive economy in which business entities vie for economic advantage. In a sense, all vendees are potential buyers of the products and services of all sellers in a given line, and success goes to him who is able to induce potential customers not to deal with a competitor." (14 Cal.3d at p. 828.)

In *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158] (*Seaman's*), overruled in part by *Freeman & Mills, Inc.* v. *Belcher Oil Co.* (1995) 11 Cal.4th 85 [44 Cal.Rptr.2d 420, 900 P.2d 669], relying on the *first* Restatement and without reviewing or even mentioning intervening revaluations of the tort by the Restatement Second, other state high courts and our own Court of Appeal, we again endorsed the prima facie tort pleading and burden of proof format, noting that "[o]nly if and when plaintiff establishes an 'intent to interfere' does the issue of 'justification' come into play. [Citation.] '[W]hile defendant's culpable *intent* is an element of the cause of action to be pleaded and proved by plaintiff, defendant's *justification* is an affirmative defense . . . .' " (36 Cal.3d at p. 766, italics in original.) We went on to observe that "[defendant] is mistaken when it implies that an improper 'motive' is an element of plaintiff's cause of action rather than a factor in defendant's affirmative defense. It is not." (*Id.* at p. 767.)

Although our opinions following *Seaman's*, *supra*, 36 Cal.3d 752, to the extent they addressed the question at all, continued to enumerate the same prima facie elements of the economic relations tort, the cases consistently denied the plaintiff recovery, on the ground, for example, that the cause of action did not encompass injury resulting from government licensing proceedings (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311 [216 Cal.Rptr. 718, 703

P.2d 58]), did not apply to sporting contests (*Youst* v. *Longo* (1987) 43 Cal.3d 64 [233 Cal.Rptr. 294, 729 P.2d 728, 85 A.L.R.4th 1025]), or to a constitutionally protected political boycott of a newspaper's advertisers by an environmental group (*Environmental Planning & Information Council* v. *Superior Court* (1984) 36 Cal.3d 188 [203 Cal.Rptr. 127, 680 P.2d 1086]), or to the filing of a potentially meritorious lawsuit (*Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118 [270 Cal.Rptr. 1, 791 P.2d 587] (*Bear Stearns*). Indeed, in concluding that the policies supporting the economic relations tort were insufficient to trump the competing interests in insuring litigants unhampered access to the courts, our opinion in *Bear Stearns* renewed and expanded on the caveat we had expressed earlier in *Buckaloo, supra,* 14 Cal.3d at page 828.

"The torts of inducing breach of contract and interference with prospective advantage have been criticized," we wrote, "as protecting the secure enjoyment of contractual and economic relations at the expense of our interest in a freely competitive economy. [Citation.] We have been cautious in defining the interference torts, to avoid promoting speculative claims. . . . Given the criticism of these causes of action and the dangers inherent in imposing tort liability for competitive business practices, we have no motivation to expand these torts so that they begin to threaten the right of free access to the courts." (*Bear Stearns, supra,* 50 Cal.3d at pp. 1136-1137, fn. omitted.)

Meanwhile, developments in the Court of Appeal and in the practical administration of such claims in the trial courts had, if anything, outdistanced our own formulations of the elements of the tort and the allocation of the burden of proof in at least two respects. First, several Court of Appeal opinions appeared to engraft onto the elements of the *plaintiff's* cause of action allegations and proof that the defendant's conduct was "wrongful" or, as the Court of Appeal said in *Tri-Growth Centre City, Ltd.* v. *Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139, 1153-1154 [265 Cal.Rptr. 330], was "based on facts that take the defendant's actions out of the realm of legitimate business transactions." (See also *Rickel* v. *Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 660 [192 Cal.Rptr. 732] ["The common denominator shared [by cases of interference with prospective economic relations] is an allegation of wrongfulness. Without this requirement of wrongfulness, we fear that actors in perfectly legitimate economic transactions would be 'put to justifying the conduct of [their] business at the whim of a rival.' "]; *A.F. Arnold & Co.* v. *Pacific Professional Ins., Inc., supra,* 27 Cal.App.3d 710, 716 ["Thus, while no particular language should be required, the facts pleaded by a plaintiff must show an

intent to do something which takes the defendant's acts beyond those of a mere competitor securing business for himself."]; *Bert G. Gianelli Distributing Co.* v. *Beck & Co.* (1985) 172 Cal.App.3d 1020, 1053 [219 Cal.Rptr. 203] ["In order to prove their cause of action plaintiffs must show . . . 'that the acts or conduct of the defendants were wrongful . . . .' "]; cf. *San Francisco Design Center Associates* v. *Portman Companies* (1995) 41 Cal.App.4th 29, 42 [50 Cal.Rptr.2d 716] ["In order to defeat the privilege [of competition] the defendant's conduct must be unlawful or illegitimate."].)

Second, in 1990, BAJI, the Book of Approved Jury Instructions widely used by trial judges in civil cases, relying on the Restatement Second of Torts and Mr. Witkin's account of the tort, included an instruction providing that a defendant in an economic relations tort case could defeat liability by showing that its conduct was not independently "wrongful." (Cf. BAJI No. 7.86.1 (8th ed. 1994) Use Note & Com.)

These developments, of course, closely reflect a nearly concurrent change in views both within the American Law Institute and in other jurisdictions. In the face of those twin lines of development, we are thus presented with the opportunity to consider whether to expressly reconstruct the formal elements of the interference with economic relations tort to achieve a closer alignment with the practice of the trial courts, emerging views within the Court of Appeal, the rulings of many other state high courts, and the critiques of leading commentators. ▆▆ ▆ ▆ We believe that we should.[4]

---

[4]Respondent contends that any change in the rules governing the plaintiff's pleading and burden of proof requirements in an economic relations tort context should be prospective only in application. He relies on the argument that at the time this case was tried, the law was settled that a plaintiff had no such burden of pleading or proving that the defendant's conduct was wrongful. The "general rule," of course, is that "a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation." (*Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 151 [181 Cal.Rptr. 784, 642 P.2d 1305], fn. omitted.) And although there are exceptions, founded on fairness and public policy, to the general rule of retroactive application of judicial decisions (see, e.g., *id.* at pp. 152-154), the circumstances of this case do not support their application here. As the main text of our opinion makes clear, litigants and counsel could have foreseen that a change in the rules regulating the pleading and burden of proof requirements in economic relations litigation was in the wind well before the time this case was tried in 1992. The modifications of the Restatement Second of Torts occurred in 1965; most of the opinions of the high courts of other American jurisdictions cited, *ante,* at pages 386-387, were decided well before 1992; and the evolution in the decisions of the Court of Appeal, traced, *ante,* at pages 390-391 began with *Rickel* v. *Schwinn Bicycle Co., supra,* 144 Cal.App.3d 648 decided in 1983. The prospect of a modification of the rule thus could fairly have been foreseen by plaintiffs and the legal profession at the time

## IV

In searching for a means to recast the elements of the economic relations tort and allocate the associated burdens of proof, we are guided by an overmastering concern articulated by high courts of other jurisdictions and legal commentators: the need to draw and enforce a sharpened distinction between claims for the tortious disruption of an *existing* contract and claims that a *prospective* contractual or economic relationship has been interfered with by the defendant. Many of the cases do in fact acknowledge a greater array of justificatory defenses against claims of interference with prospective relations. Still, in our view and that of several other courts and commentators, the notion that the two torts are analytically unitary and derive from a common principle sacrifices practical wisdom to theoretical insight, promoting the idea that the interests invaded are of nearly equal dignity. They are not.

The courts provide a damage remedy against third party conduct intended to disrupt an existing contract precisely because the exchange of promises resulting in such a formally cemented economic relationship is deemed worthy of protection from interference by a stranger to the agreement. Economic relationships short of contractual, however, should stand on a different legal footing as far as the potential for tort liability is reckoned. Because ours is a culture firmly wedded to the social rewards of commercial contests, the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties.

A doctrine that blurs the analytical line between interference with an existing business contract and interference with commercial relations *less* than contractual is one that invites both uncertainty in conduct and unpredictability of its legal effect. The notion that inducing the breach of an existing contract is simply a subevent of the "more inclusive" class of acts that interfere with economic relations, while perhaps theoretically unobjectionable, has been mischievous as a practical matter. Our courts should, in short, firmly distinguish the two kinds of business contexts, bringing a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant.

Beyond that, we need not tread today. It is sufficient to dispose of the issue before us in this case by holding that a plaintiff seeking to recover for

---

this case was tried. We discern no unfairness in applying the usual rule of full retroactivity. (Cf. *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 193 [98 Cal.Rptr. 837, 491 P.2d 421].)

alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful "by some measure beyond the fact of the interference itself."[5] (*Top Service, supra*, 582 P.2d at p. 1371.) It follows that the trial court did not commit error when it modified BAJI No. 7.82 to require the jury to find that defendant's interference was "wrongful." And because the instruction defining "wrongful conduct" given the jury by the trial court was offered by plaintiff himself, we have no occasion to review its sufficiency in this case. The question of whether additional refinements to the plaintiff's pleading and proof burdens merit adoption by California courts—questions embracing the precise scope of "wrongfulness," or whether a "disinterested malevolence," in Justice Holmes's words (*Amer. Bank & Trust Co.* v. *Federal Bank* (1921) 256 U.S. 350, 358 [65 L.Ed. 983, 990, 41 S.Ct. 499, 25 A.L.R. 971]), is an actionable interference in itself, or whether the underlying policy justification for the tort, the efficient allocation of social resources, justifies including as actionable conduct that is recognized as anticompetitive under established state and federal positive law (see, e.g., Perlman, *Interference With Contract and Other Economic Expectancies; A Clash of Tort and Contract Doctrine, supra*, 49 U. Chi. L.Rev. 61)—are matters that can await another day and a more appropriate case.

CONCLUSION

We hold that a plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself. The judgment of the Court of Appeal is reversed and the cause is remanded with directions to affirm the judgment of the trial court.

Lucas, C. J., Kennard, J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.**—I concur in the judgment.

In his complaint, plaintiff John Della Penna (hereafter Della Penna) brought various claims against defendant Toyota Motor Sales, U.S.A., Inc. (hereafter Toyota), concerning his business relationship with dealers of its

---

[5]To the extent that language in *Buckaloo, supra*, 14 Cal.3d 815, and *Seaman's, supra*, 36 Cal.3d 752, addressing the pleading and proof requirements in the economic relations tort is inconsistent with the formulation we adopt in this case, it is disapproved.

Lexus automobiles. Under the common law, he asserted a cause of action for the tort of intentional interference with prospective economic advantage. Trial was by jury. The superior court instructed on the tort. By a verdict of nine to three, the jury found in favor of Toyota and against Della Penna thereon. The Court of Appeal reversed the ensuing judgment in that part, concluding that the instructions given were prejudicially erroneous.

Like the majority, I would reverse the Court of Appeal's judgment in this regard. As I shall explain, I believe that any instructional error was not prejudicial.

I

With the dissonance caused by such terms as "malice," "justification," and "privilege" (see, e.g., Rest.2d Torts, ch. 37, introductory note, pp. 4-6), the common law on the tort of intentional interference with prospective economic advantage, both in American jurisdictions generally and in California specifically, is fast approaching incoherence. (See, e.g., Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law* (1993) 77 Minn. L.Rev. 1097, 1099 [stating that "tortious interference law suffers from considerable doctrinal confusion"]; *id.* at pp. 1120-1137 [analyzing the tort of intentional interference with prospective economic advantage]; Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine* (1982) 49 U. Chi. L.Rev. 61, 61 [noting the "absence of a coherent doctrine"]; see also Note, *Tortious Interference With Contract: A Reassertion of Society's Interest in Commercial Stability and Contractual Integrity* (1981) 81 Colum. L.Rev. 1491, 1506 [arguing, with a citation to *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799 [157 Cal.Rptr. 407, 598 P.2d 60], that "[i]n California tort protection of advantageous relations has been merged into protection against all 'foreseeable harm'"].)[1]

Before the Court of Appeal decided the seminal case of *Zimmerman* v. *Bank of America* (1961) 191 Cal.App.2d 55 [12 Cal.Rptr. 319], Witkin

---

[1]The proximate historical source of the tort of intentional inference with prospective economic advantage is the decision of the Court of Appeal in *Temperton* v. *Russell* (1893) 1 Q.B. 715, which is one of the progeny of *Lumley* v. *Gye* (Q.B. 1853) 2 El. & Bl. 216 [118 Eng.Rep. 749, the proximate historical source of the related tort of intentional interference with contract (see fn. 6, *post*).

The tort's ultimate origin, however, goes back further than *Temperton, supra,* 1 Q.B. 715. It "seems to have developed at a very early date"—specifically, between the 14th and 16th centuries—"in cases having to do with the use of physical violence, or threats of it, to drive away customers from the plaintiff's market, or those who might make donations to his church; but it seems to have been limited rather definitely to the use of such improper means. During the seventeenth and eighteenth centuries there were decisions involving threats and violence to frighten away prospective workmen or customers, and later there were others which gave

reported that "the law" on the tort of intentional interference with prospective economic advantage was "developing at a rapid rate," but that its rules were "admittedly vague" and its applications "difficult to classify." (2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, § 158, pp. 1332-1333.) More than a decade later, and in spite of *Zimmerman*'s effort to rationalize the governing principles, Witkin was compelled to make exactly the same report. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 392, p. 2643.) We then handed down our decision in *Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815 [122 Cal.Rptr. 745, 537 P.2d 865] (hereafter sometimes *Buckaloo*), which straightway became the leading authority. Today, after the passage of two decades, and notwithstanding *Buckaloo*'s further effort at rationalization, the situation remains substantially unchanged.

## A

One reason for the common law's near incoherence on the tort of intentional interference with prospective economic advantage may be discovered in its doctrinal basis.

During the second half of the 19th century and the first half of the 20th, as the times pressed hard on both law and society, common law courts, first in England and then in the United States, developed what has become known as the "prima facie tort doctrine." (Note, *The Prima Facie Tort Doctrine* (1952) 52 Colum. L.Rev. 503, 503; Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle* (1959) 54 Nw. U. L.Rev. 563, 563-566.) The traditional source was the old action on the case. (Note, *The Prima Facie Tort Doctrine, supra,* 52 Colum. L.Rev. at p. 508; Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle, supra,* 54 Nw. U. L.Rev. at p. 563.) The analytical object was a framework "capable of assisting comprehension and guiding an internal systematic development of the subject matter" (Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle, supra,* 54 Nw. U. L.Rev. at p. 563), to the end that "principle rather than precedent" might govern (Note, *The Prima Facie Tort Doctrine, supra,* 52 Colum. L.Rev. at p. 503; accord, Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle, supra,* 54 Nw. U. L.Rev. at p. 563).

---

an action for spiteful shooting to scare off the plaintiff's game. There was even a case in England in 1844 in which an actor was allowed to recover against a defendant who had succeeded in having him hissed off the stage, as a result of which he was unable to obtain further employment." (Prosser & Keeton, The Law of Torts (5th ed. 1984) Interference With Prospective Advantage, § 130, p. 1005, fns. omitted, citing cases; see Note, *Tortious Interference With Contractual Relations in the Nineteenth Century: The Transformation of Property, Contract, and Tort* (1980) 93 Harv. L.Rev. 1510, 1516-1517; Rest.2d Torts, § 766, com. c, pp. 8-10.)

In *Mogul Steamship Co.* v. *McGregor, Gow & Co.* (1889) 23 Q.B.D. 598, 613, affirmed in the House of Lords *sub nomine Mogul Steamship Company* v. *McGregor, Gow & Co.* (1891) A.C. 25, Lord Justice Bowen in the Court of Appeal made the famous statement of the prima facie tort doctrine: "[I]ntentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that person's property or trade, is actionable if done without just cause or excuse."

In *Aikens* v. *Wisconsin* (1904) 195 U.S. 194, 204 [49 L.Ed. 154, 159, 25 S.Ct. 3], Justice Holmes, who "was in large measure responsible for the introduction of the [prima facie tort] doctrine in this country" (Note, *The Prima Facie Tort Doctrine, supra*, 52 Colum. L.Rev. at p. 504; accord, Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle, supra*, 54 Nw. U. L.Rev. at p. 564), made the equally famous statement: "It has been considered that, *prima facie*, the intentional infliction of temporal damage is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading, requires a justification if the defendant is to escape."

In the middle of this century, Dean Pound made the following restatement: "One who intentionally does anything which on its face is injurious to another is liable to repair the resulting damage unless he can establish a liberty or privilege by identifying his claim to act as he did with some recognized public or social interest." (3 Pound, Jurisprudence (1959) p. 9.)

The "elements" of the "prima facie tort" have been said to be three in number.

The first comprises *intent and the likelihood of harm*. Under one view, there must be "intent to do the act complained of," which in turn must be of a sort as is "calculated in the ordinary course of events to cause" the harm "complained of." (Note, *The Prima Facie Tort Doctrine, supra*, 52 Colum. L.Rev. at pp. 505, 508.) There need not be an intent to cause harm. (*Id.* at p. 505; see Carpenter, *Interference With Contract Relations* (1928) 41 Harv. L.Rev. 728, 735 [stating that "[m]alice in the sense of bad motive is not a requisite"].) Under another view, however, intent to cause harm is indeed necessary. (Note, *The Prima Facie Tort Doctrine, supra*, 52 Colum. L.Rev. at pp. 506-507.)

The second is *harm*. "Since prima facie tort law is an outgrowth of the action on the case, its primary purpose is remedial . . . ." (Note, *The Prima Facie Tort Doctrine, supra*, 52 Colum. L.Rev. at p. 508.) As a result, harm is necessary: it embraces pecuniary loss and perhaps other loss as well. (*Id.* at

pp. 508-509; accord, Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle, supra,* 54 Nw. U. L.Rev. at p. 570 [stating that harm "is the essence of the 'action,' wherefore nominal damages cannot be sought"].)

The third is *justification or privilege.* "The interests of the parties and that of society form the matrix out of which the decision" whether the defendant's conduct is justified or privileged "is rendered." (Note, *The Prima Facie Tort Doctrine, supra,* 52 Colum. L.Rev. at p. 509; see Carpenter, *Interference With Contract Relations, supra,* 41 Harv. L.Rev. at pp. 745-762 [speaking expressly of the tort of intentional interference with prospective economic advantage, among others].) Generally, "an infinite variety of situations can develop, and each case must turn on its special facts." (Note, *The Prima Facie Tort Doctrine, supra,* 52 Colum. L.Rev. at p. 510.) So far as pleading and proof are concerned, the issue of justification or privilege has traditionally operated as an affirmative defense for the interfering party as defendant, and not as a part of the cause of action for the interfered-with party as plaintiff. (Dobbs, *Tortious Interference With Contractual Relationships* (1980) 34 Ark. L.Rev. 335, 338, fn. 19; cf. *Buckaloo* v. *Johnson, supra,* 14 Cal.3d at pp. 827-828 [same as to the tort of intentional interference with prospective economic advantage].)

It is the prima facie tort doctrine that is the basis of the tort of intentional interference with prospective economic advantage. (E.g., Dobbs, *Tortious Interference With Contractual Relationships, supra,* 34 Ark. L.Rev. at pp. 337-338; Note, *The Prima Facie Tort Doctrine, supra,* 52 Colum. L.Rev. at pp. 504-505, 508 [speaking impliedly of the tort of intentional interference with prospective economic advantage]; Carpenter, *Interference With Contract Relations, supra,* 41 Harv. L.Rev. at pp. 732-762 [speaking expressly of this tort among others]; see, e.g., *Diaz* v. *Kay-Dix Ranch* (1970) 9 Cal.App.3d 588, 591-592 [88 Cal.Rptr. 443] [expressly recognizing the prima facie tort doctrine as the basis of this tort]; *Buxbom* v. *Smith* (1944) 23 Cal.2d 535, 546 [145 P.2d 305] [impliedly recognizing as much].)

That fact is apparent in section 766 of the first Restatement of Torts. It provides that, generally, "one who, without a privilege to do so, induces or otherwise purposely causes a third person not to" "enter into or continue a business relation with another" "is liable to the other for the harm caused thereby."

The prima facie tort doctrine, however, is problematic. Very much so. The question has been asked whether it "has served any purpose other than to provide a sonorous apothegm better suited to opinion writing than decision

making." (Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle*, *supra*, 54 Nw. U. L.Rev. at p. 564.) The answer is no.

The prima facie tort doctrine exhibits a general deficiency. Perhaps it has resulted in a kind of "internal systematic development of the subject matter." (Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle*, *supra*, 54 Nw. U. L.Rev. at p. 563.) But if it has, it has done so by sacrificing an external connection to society. "The idea is that 'intentional infliction of harm' is, prima facie, a tort. The problem is that almost any legitimate act can cause 'intentional' harm . . . ." (Dobbs, *Tortious Interference With Contractual Relationships*, *supra*, 34 Ark. L.Rev. at pp. 337-338, fn. 18.) Therefore, "[i]t must be understood that intentional infliction of harm . . . covers a multitude of desirable acts as well as a multitude of sins." (*Id.* at p. 345; see *Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co.* (1978) 283 Or. 201, 205 [582 P.2d 1365, 1368]; *Leigh Furniture and Carpet Co.* v. *Isom* (Utah 1982) 657 P.2d 293, 303 [following *Top Serv. Body Shop*].) "The prima facie tort rule, then, is not a rule about wrongdoing at all. It seems to be a philosophical effort to state all"—or at least much—of "tort law in a single sentence rather than an effort to state a meaningful principle." (Dobbs, *Tortious Interference With Contractual Relationships*, *supra*, 34 Ark. L.Rev. at p. 345.) "[P]rinciple rather than precedent" may indeed govern. (Note, *The Prima Facie Tort Doctrine*, *supra*, 52 Colum. L.Rev. at p. 503.) But it is a principle that is peculiarly empty.

The prima facie tort doctrine exhibits a specific deficiency with regard to the tort of intentional interference with prospective economic advantage. "Since not all interference [is] actionable, or even morally wrong, it cannot be said that there [is] some principle against interference. Since there is no hint in such abstract statements of liability as to what might constitute a defense it is difficult to believe that there is actually any principle involved at all. It has rather the faded ambience of a 'universal truth' once thought to be discoverable in law. In any event, this [leaves] the defendant in an interference case knowing he [is] entitled to some defense, but not knowing what defenses would be accounted sufficient." (Dobbs, *Tortious Interference With Contractual Relationships*, *supra*, 34 Ark. L.Rev. at p. 345.)

## B

A second reason for the common law's near incoherence on the tort of intentional interference with prospective economic advantage may be discovered within the law itself.

To borrow words from *Brennan* v. *United Hatters of North America, Local No. 17* (1906) 73 N.J.L. (44 Vroom) 729, 742 [65 A. 165, 171], the premise

of the tort seems to be that, "[i]n a civilized community which recognizes the right of private property among its institutions, the notion is intolerable that a man should be protected by the law in the enjoyment of property once it is acquired, but left unprotected by the law in his efforts to acquire it."

The tort's "protectionist" premise, however, is at war with itself. For the person who deserves protection in the acquisition of property is not only the interfered-with party but also the interfering party. Why then should the interfered-with party receive favor, while the interfering party is disfavored, by virtue of their respective statuses? Why should the interfered-with party's acquisitive efforts be elevated to a kind of property interest, good against the world, while those of the interfering party are deemed illegitimate? It is "often assumed . . . that interference . . . should produce liability because it is wrong to interfere. This is, however, very much the same as saying it is wrong because it is wrong." (Dobbs, *Tortious Interference With Contractual Relationships*, supra, 34 Ark. L.Rev. at p. 343 [speaking expressly of interference with contract].) In the words Lord Bramwell spoke in the House of Lords in *Mogul Steamship Co.* v. *McGregor, Gow & Co.*, supra, A.C. 25, 47, affirming *Mogul Steamship Co.* v. *McGregor, Gow & Co.*, supra, 23 Q.B.D. 598, "[i]t does seem strange"—and more than strange—"that to enforce *freedom* of trade, of action, the law should punish" the interfering party "who make[s] . . . perfectly honest" arrangements "with a belief" that they are "fairly required for [his] protection," whereas it rewards the interfered-with party who does likewise. (Italics in original.) Reason supports the conclusion that, even when there is a breach of contract, the interfered-with party should not be preferred over the interfering party: the breach may be "efficient." (See, e.g., Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law*, supra, 77 Minn. L.Rev. at pp. 1119-1120; Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine*, supra, 49 U. Chi. L.Rev. at pp. 78-91; Dobbs, *Tortious Interference With Contractual Relationships*, supra, 34 Ark. L.Rev. at pp. 360-361.) Reason practically compels the same conclusion when there is no breach because there is no contract. (See Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine*, supra, 49 U. Chi. L.Rev. at pp. 90-91.)

Further, liability under the tort may threaten values of greater breadth and higher dignity than those of the tort itself.

One is the common law's policy of freedom of competition. " 'The policy of the common law has always been in favor of free competition, which

proverbially is the life of trade. So long as the plaintiff's contractual relations are merely contemplated or potential, it is considered to be in the interest of the public that any competitor should be free to divert them to himself by all fair and reasonable means. . . . In short, it is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability.' " (*A-Mark Coin Co.* v. *General Mills, Inc.* (1983) 148 Cal.App.3d 312, 323-324 [195 Cal.Rptr. 859], quoting, without fns., Prosser, The Law of Torts (4th ed. 1971) Interference With Prospective Advantage, § 130, pp. 954-955; see, e.g., Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law, supra*, 77 Minn. L.Rev. at p. 1107.)

Another of these values expresses itself in the guaranty of freedom of speech in the First Amendment to the United States Constitution.[2] "[S]ociety places a high value on free speech." (Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine, supra*, 49 U. Chi. L.Rev. at p. 74.) " 'The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole.' " (*Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1041 [232 Cal.Rptr. 542, 728 P.2d 1177], quoting *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 503-504 [80 L.Ed.2d 502, 518-519, 104 S.Ct. 1949].) The interfering party, however, often interferes by means of words. It has been said that, "so far as tort liability is imposed for the communication of facts, opinions or arguments, that liability is simply inconsistent with the law's long commitment to free speech." (Dobbs, *Tortious Interference With Contractual Relationships, supra*, 34 Ark. L.Rev. at p. 361; see generally, *id.* at pp. 361-363.)[3] At the very least, the "need for limits is acute . . . ." (Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort*

---

[2]The First Amendment, of course, is made applicable to the states through the due process clause of the Fourteenth Amendment. (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 277 [11 L.Ed.2d 686, 704-705, 84 S.Ct. 710, 95 A.L.R.2d 1412].)

[3]Compare *McKay* v. *Retail Auto. S.L. Union No. 1067* (1940) 16 Cal.2d 311, 319 [106 P.2d 373] (implying that intentional interference with prospective economic advantage by a labor union through peaceful and truthful picketing is nontortious: the right to engage in such picketing "is one of organized labor's lawful means of advertising its grievances to the public, and as such is guaranteed by the Constitution as an incident of freedom of speech").

*Doctrine, supra,* 49 U. Chi. L.Rev. at p. 74.) It matters not that the words in question may amount only to so-called "commercial speech." (See *Paradise Hills Associates* v. *Procel* (1991) 235 Cal.App.3d 1528, 1544-1545 [1 Cal.Rptr.2d 514].) That is because "commercial speech is not 'wholly outside the protection of the First Amendment[.]' " (*Linmark Associates, Inc.* v. *Willingboro* (1977) 431 U.S. 85, 91 [52 L.Ed.2d 155, 161, 97 S.Ct. 1614], quoting *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 761 [48 L.Ed.2d 346, 358, 96 S.Ct. 1817].)

A related value is found in the First Amendment's guaranty of freedom of association. "[O]ne of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal by lawful means." (*NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886, 933 [73 L.Ed.2d 1215, 1249, 102 S.Ct. 3409].) But when individuals join with each other to achieve an objective and undertake to act in the economic sphere, they run the risk that they will collectively be deemed an interfering party. Thus it happened to labor unionists, in the decades before and after the turn of the century, as they engaged in struggle over the terms and conditions of employment. (See, e.g., Note, *Tortious Interference With Contractual Relations in the Nineteenth Century: The Transformation of Property, Contract, and Tort, supra,* 93 Harv. L.Rev. at pp. 1529-1537 [dealing with torts including that of intentional interference with prospective economic advantage]; Sayre, *Inducing Breach of Contract* (1923) 36 Harv. L.Rev. 663, 690-696 [same].)[4] And thus it has happened in the present day as members of minority groups have sought to secure and exercise their political and civil rights. (See, e.g., *NAACP* v. *Claiborne Hardware Co., supra,* 458 U.S. at pp. 888-906 [73 L.Ed.2d at pp. 1220-1232].) It follows that associational freedom, too, calls for the limitation of liability under the tort.

Still another value inheres in the First Amendment's guaranty of the people's right to petition the government for redress of grievances. This protection is one of our "great, . . . indispensable democratic freedoms," and occupies a "preferred place . . . in our scheme." (*Thomas* v. *Collins* (1945) 323 U.S. 516, 530 [89 L.Ed. 430, 440, 65 S.Ct. 315].) The interfering party, however, may interfere by raising his voice and expressing his

[4]Indeed, *Temperton* v. *Russell, supra,* 1 Q.B. 715, which, as noted, is the proximate historical source of the tort of intentional inference with prospective economic advantage (see fn. 1, *ante*), arose out of a struggle of labor unionists and was decided adverse to their interests. (See *Moore* v. *Cooks etc. Union No. 402* (1919) 39 Cal.App. 538, 541 [179 P. 417] [affirming a judgment enjoining unions from picketing a business: "Peaceful picketing! There is no such thing . . . . We are in full accord with the doctrine . . . that 'there is, and can be, no such thing as peaceful picketing, any more than there can be chaste vulgarity, or peaceful mobbing, or lawful lynching.' "].)

views to governmental authorities. (See *Matossian* v. *Fahmie* (1980) 101 Cal.App.3d 128, 135-137 [161 Cal.Rptr. 532]; see also *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1133, 1135 [270 Cal.Rptr. 1, 791 P.2d 587].) To be sure, the "grievances for redress of which the right of petition was insured" include "religious [and] political ones" and others of that stature. (*Thomas* v. *Collins, supra*, 323 U.S. at p. 531 [89 L.Ed. at p. 441].) But they may embrace as well even such as relate merely to "business or economic activity." (*Ibid.*) Thus, the right of petition also calls for the limitation of liability under the tort. (Carpenter, *Interference With Contract Relations, supra*, 41 Harv. L.Rev. at pp. 751-752.)[5]

## C

A third reason for the common law's near incoherence on the tort of intentional interference with prospective economic advantage may be discovered in its focus on the interfering party's motive, that is, *why* he seeks whatever it is that he seeks through his interference, and on his moral character as revealed thereby.

That there *is* a focus on the interfering party's motive cannot be doubted. (See, e.g., *Hofmann Co.* v. *E.I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 401-402 [248 Cal.Rptr. 384]; *Rickel* v. *Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 659 [192 Cal.Rptr. 732]; *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 18 [144 Cal.Rptr. 664]; *A.F. Arnold & Co.* v. *Pacific Professional Ins., Inc.* (1972) 27 Cal.App.3d 710, 714-717 [104 Cal.Rptr. 96].) Sometimes motive is associated with the "empty" term "malice" (Sayre, *Inducing Breach of Contract, supra*, 36 Harv. L.Rev. at p. 675; see Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine, supra*, 49 U. Chi. L.Rev. at p. 94; Dobbs, *Tortious Interference With Contractual Relationships, supra*, 34 Ark. L.Rev. at p. 342); sometimes it is not. Nevertheless, the focus on motive remains. To state the point thus runs the risk of understatement. For motive is not merely important: it has been said to be "crucial." (*Hofmann Co.* v. *E.I. Du Pont de Nemours & Co., supra*, 202 Cal.App.3d at p. 402; see Rest.2d Torts, § 766B, com. d, pp. 22-23 [to similar, if qualified,

---

[5]In *Pacific Gas & Electric Co.* v. *Bear Stearns & Co., supra*, 50 Cal.3d at page 1133, we expressed a concern that "to permit . . . [a] cause of action" asserting the tort might, in certain contexts, "impair free access to the courts . . . ." Such access is protected, insofar as the states are concerned, by the Fourteenth Amendment's guaranty of due process of law (see *Logan* v. *Zimmerman Brush Co.* (1982) 455 U.S. 422, 428-433 [71 L.Ed.2d 265, 272-276, 102 S.Ct. 1148]) and also by its guaranty of equal protection of the laws (see *id.* at pp. 438-442 [71 L.Ed.2d at pp. 279-282] (conc. opn. of Blackmun, J.); *id.* at pp. 443-444 [71 L.Ed.2d at p. 282-284] (conc. opn. of Powell, J.)).

effect]; Prosser & Keeton, The Law of Torts, *supra*, Interference With Prospective Advantage, § 130, pp. 1009-1010, 1014 [same].)

In spite of the many words devoted to the topic, the focus on the interfering party's motive is simply inappropriate. That is because, for present purposes, motive is altogether immaterial.

In *Boyson* v. *Thorn* (1893) 98 Cal. 578, 583-584 [33 P. 492] (hereafter sometimes *Boyson*), which deals with the related tort of intentional interference with contract (*Buckaloo* v. *Johnson*, *supra*, 14 Cal.3d at p. 823),[6] we stated: "It is a truism of the law that an act which does not amount to a legal injury cannot be actionable because it is done with a bad intent; that what one has a right to do another cannot complain of. It is conceded that one may lawfully persuade or procure another to break his contract with a third person, 'if it be done from good motives.' We think the qualification has no place in the proposition. If it is right, and the *means* used to procure the breach are right, the motive cannot make it a wrong any more than a good motive would justify fraud, deceit, slander, or violence to effect the same purpose. Suppose A, by fraudulent representations, induces B to sell him a large quantity of goods upon credit, intending to defraud B of the entire value of the goods. C, knowing that the representations are false, and not caring whether B shall lose his goods or not, but of unmixed malice and ill-will toward A, procures B to refuse to deliver the goods by truthfully informing B of the falsity of the representations made by A, will it be said

---

[6]The proximate historical source of the tort of intentional interference with contract is *Lumley* v. *Gye*, *supra*, 2 El. & Bl. 216. (See fn. 1, *ante*.)

The tort's ultimate origin, however, is much older. "One form . . . can be traced back to very ancient times"—under early Roman law—"when it was not the existence of a contract which was important, but the status, or relation recognized by the law, in which the parties stood toward one another, and with which the defendant interfered. . . . By the thirteenth century this Roman law idea had been taken over by the common law, but had been somewhat altered in the transition, so that it became an action for damage sustained by any master through actual loss of the services of a servant because of violence inflicted upon him. In 1349 an additional remedy was created by statute. The Black Death had left England with a great shortage of labor, and to meet the resulting agricultural crisis the famous Ordinance of Labourers was enacted, by which a system of compulsory labor was introduced. A penalty was provided to keep the laborer from running away, and a remedy was given to the employer against anyone who received and retained him in his service. The statutory action for enticing or harboring the servant which thus developed, as well as the older one for violence against him, was enforced in trespass. In time the two became intermingled and confused, so that they were no longer distinguished, and at last both were absorbed into the action on the case." (Prosser & Keeton, The Law of Torts, *supra*, Interference With Contractual Relations, § 129, pp. 979-980, fns. omitted, citing cases and other authorities; see Note, *Tortious Interference With Contractual Relations in the Nineteenth Century: The Transformation of Property, Contract, and Tort*, *supra*, 93 Harv. L.Rev. at pp. 1511-1521; Rest.2d Torts, § 766B, com. b, pp. 21-22; Sayre, *Inducing Breach of Contract*, *supra*, 36 Harv. L.Rev. at pp. 663-666.)

that C is liable in an action brought by A? . . . 'Bad motive, by itself, then, is no tort. Malicious motives make a bad act worse, but they cannot make that a wrong which in its own essence is lawful. When in legal pleadings the defendant is charged with having wrongfully done the act complained of, the words are only words of vituperation, and amount to nothing unless a cause of action is otherwise alleged.' " (Italics in original.)

In *Boyson*, we followed Lord Chief Justice Coleridge. In *Bowen* v. *Hall* (1881) 6 Q.B.D. 333, 344 (hereafter sometimes *Bowen*), which was decided by the Court of Appeal, he rejected the proposition, *dissentiente*, that "the same person for doing the same thing under the same circumstances with the same result is actionable or not actionable according to whether his inward motive was selfish or unselfish for what he did."

In *Boyson*, we also anticipated Lord Watson. In *Allen* v. *Flood* (1898) A.C. 1, 92, which was handed down by the House of Lords, he declared that "the law . . . does not . . . take into account motive as constituting an element of civil wrong.[7] Any invasion of the civil rights of another is in itself a legal wrong, carrying with it liability to repair its necessary or natural consequences, in so far as these are injurious to the person whose right is infringed, whether the motive which prompted it be good, bad, or indifferent. But the existence of a bad motive, in the case of an act which is not in itself illegal, will not convert that act into a civil wrong for which reparation is due."[8]

---

[7]See Note, *The Prima Facie Tort Doctrine, supra*, 52 Colum. L.Rev. at pages 507 to 508, footnote 33 (stating that "[i]n England it is doubtful whether motive has any bearing upon the legality of a harmful act, except where there is more than one participant"); Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine, supra*, 49 U. Chi. L.Rev. at page 95, footnote 145 (to similar effect).

[8]In *Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33, 38 [112 P.2d 631], we disapproved *Boyson* on the immateriality of the interfering party's motive. For the reasons stated in the text, I believe that we erred thereby. I recognize that the "literature on the place of motive in civil liability is larded with great names . . . ." (Dobbs, *Tortious Interference With Contractual Relationships, supra*, 34 Ark. L.Rev. at p. 347, fn. 53, citing Ames, *How Far an Act May Be a Tort Because of the Wrongful Motive of the Actor* (1905) 18 Harv. L.Rev. 411, and Holmes, *Privilege, Malice, and Intent* (1894) 8 Harv. L.Rev. 1.) But the discussion therein is "often not aimed at the question whether motive should be considered or how it fits in the structure or method of decision." (Dobbs, *Tortious Interference With Contractual Relationships, supra*, 34 Ark. L.Rev. at p. 347, fn. 53; see Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law, supra*, 77 Minn. L.Rev. at pp. 1131-1132 [impliedly affirming the "principle that a lawful act should not become unlawful because of wrongful motive"]; see also Prosser & Keeton, The Law of Torts, *supra*, Interference With Prospective Advantage, § 130, p. 1011 [stating that "although courts have traditionally felt free to consider the defendant's subjective motives or purposes and such states of mind as spite or ill-will, decisions of the Supreme Court in other communicative tort

Even if it were not inappropriate, the focus on the interfering party's motive surely has a tendency to yield untoward results. (See Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine, supra,* 49 U. Chi. L.Rev. at p. 95 [stating that "[p]roof of motivation . . . carries social costs"].)

To understate the point, "ambiguities [are] inherent in the motive inquiry . . . ." (Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law, supra,* 77 Minn. L.Rev. at p. 1132; accord, *Leigh Furniture and Carpet Co.* v. *Isom, supra,* 657 P.2d at p. 307 [noting that "[p]roblems" are "inherent in proving motivation"]; Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine, supra,* 49 U. Chi. L.Rev. at p. 95 [stating that "[p]roof of motivation . . . is error-prone"]; see Note, *The Prima Facie Tort Doctrine, supra,* 52 Colum. L.Rev. at p. 503 [noting the "ambiguity inherent in the word[] . . . 'malice . . .' "].)

As we declared in *Boyson,* quoting Lord Chief Justice Coleridge in *Bowen,* an inquiry of this sort is " 'dangerous and inexpedient . . . for courts of justice; judges are not very fit for [it], and juries are very unfit.' " (*Boyson* v. *Thorn, supra,* 98 Cal. at p. 583, quoting *Bowen* v. *Hall, supra,* 6 Q.B.D. at p. 344 (Coleridge, L. C. J., *dissentiente*).)

It may be hard for a trier of fact to discern the interfering party's motive because of factors peculiar to the latter. (See, e.g., Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law, supra,* 77 Minn. L.Rev. at p. 1142.) That is true when the interfering party is an individual: a person's mind and heart typically reveal themselves and conceal themselves at one and the same time. It is truer still when the interfering party is a group of individuals: many minds and hearts are then involved, and they cannot simply be added up. And, of course, it is truest when the interfering party is a corporation or similar entity: the "mind" and "heart" of such a one is purely fictive.

It may also be hard for a trier of fact to discern the interfering party's motive because of factors peculiar to itself. (See Dobbs, *Tortious Interference With Contractual Relationships, supra,* 34 Ark. L.Rev. at p. 348.) Certainly, motive may be spoken of as a fact. But it implicates a rich variety of values. As a result, it allows and perhaps even invites the trier of fact to pass a kind of moral judgment on the interfering party as such—a judgment

cases," including *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, and its progeny, "now raise potential Constitutional objections to this approach"].)

that, whether scrupulously fair and strictly impartial, on the one side, or passionately sympathetic or blindly prejudiced, on the other, is simply of no consequence here. For the "law has no roving commission to root out bad people or people whose minds may harbor bad thoughts." (*Id.* at pp. 347-348.) Neither does it undertake to select for reward people of the opposite sort. Indeed, it has "generally shared" "the belief . . . that it is impermissible for" it " to judge one's person rather than one's conduct." (*Id.* at p. 347.) Thus, it treats all as equal before its bar, whether some may seem to be "small dealers and worthy men" (*United States* v. *Freight Association* (1897) 166 U.S. 290, 323 [41 L.Ed. 1007, 1021, 17 S.Ct. 540]) and others "rapacious monopolists" (*Charles River Bridge* v. *Warren Bridge* (1837) 36 U.S. (11 Pet.) 420, 518 [9 L.Ed. 773, 812]).

The untoward results of the focus on the interfering party's motive may present themselves in individual cases in the form of arbitrary and capricious outcomes. (See Dobbs, *Tortious Interference With Contractual Relationships*, *supra*, 34 Ark. L.Rev. at p. 356.) In matters in which the trier of fact believes it has discerned good motive or at least persuades itself it has, an interfering party who has both engaged in objectively bad conduct and produced objectively bad consequences may evade liability for injury. By contrast, in matters in which it adopts a contrary view, an interfering party who has neither engaged in such conduct nor produced such consequences may be made to pay for what is simply *damnum absque injuria*. In a word, much may depend on mere appearances and perceptions and on nothing more.

Such untoward results, however, will not confine themselves to individual cases but will spread generally to deter what should be encouraged (see, e.g., Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law*, *supra*, 77 Minn. L.Rev. at pp. 1142-1143) and also to encourage what should be deterred. The example of the interfering party who has both engaged in objectively bad conduct and produced objectively bad consequences, but has nevertheless evaded liability, may lure others to follow in his steps, and thereby cause detriment to society as a whole. Conversely, the example of the interfering party who has neither engaged in such conduct nor produced such consequences, but has still been made to pay, may serve to turn aside others, and thereby deny the community the benefit of good acts and good effects or at least the freedom to do as one chooses when he does no injury. Moreover, the example of both may lead to further social costs, as "properly motivated actors" take "precautions . . . to avoid liability" that they should not be exposed to (Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine*, *supra*, 49 U. Chi. L.Rev. at p. 97), and actors otherwise motivated fabricate schemes to escape responsibility that they deserve.

## II

With all this said, we are put to the question: what are we to do about the tort of intentional interference with prospective economic advantage?

It would be unreasonable to choose to do nothing. As stated, in this regard the common law is approaching incoherence. It is not about to turn to consistency of its own accord.

It would also be unreasonable to choose abolition. Such a course commands little support among courts or commentators. That is unsurprising. Most agree that the interfering party should not be granted general immunity, but should be exposed to liability under at least some circumstances. (See, e.g., *Leigh Furniture and Carpet Co.* v. *Isom, supra,* 657 P.2d at pp. 302-304; *Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co., supra,* 283 Ore. at pp. 204-210 [582 P.2d at pp. 1368-1371]; Rest.2d Torts, § 766B, pp. 20-23; Prosser & Keeton, The Law of Torts, *supra,* Interference With Prospective Advantage, § 130, pp. 1005-1031; Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law, supra,* 77 Minn. L.Rev. at p. 1149; Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine, supra,* 49 U. Chi. L.Rev. at pp. 97-99; Dobbs, *Tortious Interference With Contractual Relationships, supra,* 34 Ark. L.Rev. at pp. 363-376; but see Note, *Tortious Interference With Contract: A Reassertion of Society's Interest in Commercial Stability and Contractual Integrity, supra,* 81 Colum. L.Rev. at p. 1515; Sayre, *Inducing Breach of Contract, supra,* 36 Harv. L.Rev. at pp. 670, fn. 22, 673, & 700.) For just as "[i]t cannot be . . . a theorem of justice that liability is always just" (Dobbs, *Tortious Interference With Contractual Relationships, supra,* 34 Ark. L.Rev. at p. 337), neither can it be a principle of law that immunity is invariably proper.

In view of the foregoing, the only reasonable choice is reformulation. Indeed, an undertaking of this sort is compelled by the almost unanimous agreement, referred to above, that the interfering party should not be allowed to interfere with impunity at all times and under all circumstances.

To this end, we should clearly define the tort, basing it on stable and circumscribed ground, and eschewing the prima facie tort doctrine, the "protectionist" premise, and the interfering party's motive. Our focus should be on *objective* conduct and consequences. Further, our concern should be with such conduct and consequences as are *unlawful.*

General considerations of a formal nature counsel us to take this path. As noted, the tort's rules are "admittedly vague" and their applications "difficult

to classify." An objective definition based on unlawfulness, cast in under-standable and usable terms, would reduce or remove such weaknesses.

Specific concerns of a substantive kind operate as well. It is plain from the above discussion that the tort is based on the problematic prima facie tort doctrine. In addition, it implicates the "protectionist" premise, which carries internal inconsistency and also threatens the common law's policy of free-dom of competition and the First Amendment's guaranty of freedom of speech, freedom of association, and right of petition. Lastly, it has a ten-dency to yield untoward results, both in individual cases and generally, through its focus on the interfering party's motive. An objective definition based on unlawfulness, developed in light of such facts, would cure or mitigate the deficiency of the doctrine, lessen or eliminate the flaw attribut-able to the premise, and decrease or neutralize the danger to the policy and the guaranty.

Thus reformulated, the tort requires objective, and unlawful, conduct or consequences.[9]

It follows that the tort may be satisfied by intentional interference with prospective economic advantage *by independently tortious means.* (Accord, e.g., *Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co., supra,* 283 Or. at pp. 209-210 [582 P.2d at p. 1371]; Prosser & Keeton, The Law of Torts, *supra,* Interference With Prospective Advantage, § 130, pp. 1014-1015; Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tor-tious Interference Law, supra,* 77 Minn. L.Rev. at p. 1149; Perlman, *Inter-ference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine, supra,* 49 U. Chi. L.Rev. at pp. 97-99; Dobbs, *Tortious*

---

[9]A question that raises itself at this juncture is whether the related tort of intentional interference with contract (see fn. 1, *ante*) should be reformulated to require objective, and unlawful, conduct or consequences. It need not be addressed here. That tort is simply not implicated in this action. I note in passing that either an affirmative or a negative answer might be given to the question of reformulation. An affirmative answer might be supported by reasoning such as that presented in the text. In contrast, a negative answer might be sustained on a view that the tort in question "protects society's interest in preserving the formal integrity of contract and rests on an implicit appreciation of the fundamental, structure-giving significance of contracts in a market economy." (Note, *Tortious Interference With Contract: A Reassertion of Society's Interest in Commercial Stability and Contractual Integrity, supra,* 81 Colum. L.Rev. at p. 1523; accord, *Imperial Ice Co.* v. *Rossier, supra,* 18 Cal.2d at p. 36; Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law, supra,* 77 Minn. L.Rev. at pp. 1121, 1150; but see Dowling, *A Contract Theory for a Complex Tort: Limiting Interference With Contract Beyond the Unlawful Means Test* (1986) 40 U. Miami L.Rev. 487, 510-511 [arguing that the action for "intentional interference with business relations" is "more historically and economically sound" than that for "interference with contract" and, as such, "deserves stronger protection"].)

*Interference With Contractual Relationships, supra,* 34 Ark. L.Rev. at pp. 365-366; see, e.g., *Leigh Furniture and Carpet Co.* v. *Isom, supra,* 657 P.2d at p. 304 [following *Top Serv. Body Shop*]; Rest.2d Torts, § 766B, com. e, p. 23.)

The interfering party is properly liable to the interfered-with party in such a situation. That is most plainly true when the independently tortious means the interfering party uses are tortious *as to the interfered-with party himself.* By the tort's very nature, the interfered-with party is an intended (or at least known) victim of the interfering party. (See *Ramona Manor Convalescent Hospital* v. *Care Enterprises* (1986) 177 Cal.App.3d 1120, 1132-1134 [225 Cal.Rptr. 120].) But it is true as well when the independently tortious means the interfering party uses are independently tortious *only as to a third party.* Even under these circumstances, the interfered-with party remains an intended (or at least known) victim of the interfering party—albeit one that is indirect rather than direct. (See Rest.2d Torts, § 767, com. c, pp. 29-30.) In this situation, the means in question are independently tortious as to the third party "if those elements that pertain to" the interfering party "are present" even if those that pertain to the third party are not: "For instance, fraudulent misrepresentations made" by the interfering party to a "third party are improper means of interference . . . whether or not the third party can show reliance injurious to himself." (*Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co., supra,* 283 Or. at p. 210, fn. 11 [582 P.2d at p. 1371].)[10]

It also follows that the tort may be satisfied by intentional interference with prospective economic advantage *through restraint of trade, including monopolization.* (Accord, Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law, supra,* 77 Minn. L.Rev. at p. 1149; Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine, supra,* 49 U. Chi. L.Rev. at pp. 97-99; Dobbs, *Tortious Interference With Contractual Relationships, supra,* 34 Ark. L.Rev. at pp. 367-368; see *Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co., supra,* 283 Or. at pp. 209-210 [582 P.2d at p. 1371]; *Leigh Furniture and Carpet Co.* v. *Isom, supra,* 657 P.2d at p. 304 [following *Top Serv. Body Shop*].)

---

[10] When the interfering party intentionally interferes by independently tortious means, the interfered-with party, of course, is entitled to compensatory damages pursuant to section 3281 et seq. of the Civil Code if he suffers harm. In view of the fact that what is protected is his *prospective economic advantage* (see *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 330 [216 Cal.Rptr. 718, 703 P.2d 58]), such harm should be defined as his *prospective economic loss* (see *Youst* v. *Longo* (1987) 43 Cal.3d 64, 71, fn. 6 [233 Cal.Rptr. 294, 729 P.2d 728]). He may also be entitled to exemplary damages under certain circumstances pursuant to section 3294 et seq. of the same code.

As explained, the common law's policy of freedom of competition informs the principles that govern here. To use language written in the related context of antitrust, that policy seeks "to maximize consumer . . . welfare through efficiency in the use and allocation of scarce resources, and via progressiveness in the development of new productive techniques and new products that put those resources to better use." (1 Areeda & Turner, Antitrust Law (1978) ¶ 103, p. 7; see *Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 918-919 [221 Cal.Rptr. 575, 710 P.2d 375].) To use more of such language, the policy "rest[s] 'on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.' " (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 935 [130 Cal.Rptr. 1, 549 P.2d 833], quoting *Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1, 4 [2 L.Ed.2d 545, 549, 78 S.Ct. 514].) Restraint of trade, however, adversely affects consumer welfare. "Price is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference." (*NCAA* v. *Board of Regents of Univ. of Okla.* (1984) 468 U.S. 85, 107 [82 L.Ed.2d 70, 87, 104 S.Ct. 2948].)

The interfering party is properly liable to the interfered-with party when he restrains trade. By the tort's very nature, as stated above, the interfered-with party is the intended (or at least known) victim of the interfering party. When the interfering party restrains trade, he causes injury to the interfered-with party at least through adverse effect on consumer welfare.[11]

So reformulated, the tort can be distinctly stated and consistently applied.

The independently tortious means that commonly appear in this context, including assault and battery, defamation, and fraud and deceit (*Top Serv. Body Shop Inc.* v. *Allstate Ins. Co., supra,* 283 Or. at p. 210, fn. 11 [582 P.2d at p. 1371]; *Leigh Furniture and Carpet Co.* v. *Isom, supra,* 657 P.2d at p. 308 [following *Top Ser. Body Shop*]; see Rest.2d Torts, § 767, com. c, p. 30;

---

[11]When the interfering party intentionally interferes through restraint of trade, the interfered-with party's entitlement to compensatory and exemplary damages is generally as stated above. (See fn. 10, *ante.*) But by analogy to section 4 of the Clayton Act, as construed in *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.* (1977) 429 U.S. 477, 489 [50 L.Ed.2d 701, 712-713, 97 S.Ct. 690], it may be argued that, in such a situation, compensatory damages should be limited to prospective economic loss (see fn. 10, *ante*) *of the type that was intended to be prevented by, and flows from violation of, the common law's policy of freedom of competition.* Such a point is not insubstantial. Its acceptance or rejection, however, may be left to another day.

Prosser & Keeton, The Law of Torts, *supra*, Interference With Prospective Advantage, § 130, p. 1009), are well defined and long settled (see, e.g., 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 346-377, pp. 436-463 [assault and battery]; *id.*, §§ 471-566, pp. 557-661 [defamation]; *id.*, §§ 674-719, pp. 775-819 [fraud and deceit].) Surely, one would not be left to the scant "guidance" of the so-called " 'business ethics' standard" (Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law*, *supra*, 77 Minn. L.Rev. at p. 1136), which presupposes that "[t]he nature of the conduct which is acceptable today may . . . prove unacceptable tomorrow" (*A.F. Arnold & Co.* v. *Pacific Professional Ins., Inc.*, *supra*, 27 Cal.App.3d at pp. 716-717).

Also, restraints of trade may be "measured by objective economic criteria." (Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law*, *supra*, 77 Minn. L.Rev. at p. 1104.) Decisions under federal antitrust statutes since *Continental T.V., Inc.* v. *GTE Sylvania Inc.* (1977) 433 U.S. 36 [53 L.Ed.2d 568, 97 S.Ct. 2549] prove the point beyond question. (See Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law*, *supra*, 77 Minn. L.Rev. at pp. 1101-1106.)

Moreover, the tort's internally inconsistent "protectionist" premise is now removed. The interfered-with party is not favored over the interfering party by virtue of their respective status: the former is merely protected against the latter's use of independently tortious means and restraints of trade.

Furthermore, the tort itself does not now impair the common law's policy of freedom of competition. By its very terms, the freedom in question does *not* extend to the use of independently tortious means or restraints of trade.

Neither does the tort now undermine the First Amendment's guaranty of freedom of speech, freedom of association, or right of petition. That is because, to the extent that speech or association or petitioning is involved, the federal constitutional provision itself limits liability. (See, e.g., *NAACP* v. *Claiborne Hardware Co.*, *supra*, 458 U.S. at pp. 907-920 [73 L.Ed.2d at pp. 1232-1241] [dealing with speech and association]; *Blatty* v. *New York Times Co.*, *supra*, 42 Cal.3d at pp. 1045-1048 [dealing with speech]; *Matossian* v. *Fahmie*, *supra*, 101 Cal.App.3d at pp. 135-137 [dealing with petitioning].)[12]

Finally, in any action based on the tort, it is the interfered-with party as plaintiff who should bear the burden of pleading and the burden of proof as

---

[12]Whether the tort may be satisfied by intentional interference *other than* by independently tortious means *or* through restraint of trade is a question that should remain open. I note in

to whether there has been intentional interference with prospective economic advantage either by independently tortious means or through restraint of trade by the interfering party as defendant. The general rule is that a party has the burden to plead (1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 133, p. 117) and the burden to prove (Evid. Code, § 500) "each fact the existence or nonexistence of which is essential to the claim for relief . . . that he is asserting" (*ibid.*). The existence of the indicated intentional interference is obviously essential to the interfered-with party's cause of action. There is no reason that would justify the creation of an exception to the general rule in order to shift either burden to the interfering party.[13]

## III

Let us turn now to the case at bar.

In pertinent part, the superior court instructed the jury that the elements of the tort of intentional interference with prospective economic advantage were these: (1) an "economic relationship existed between" Della Penna "and various Lexus dealers, containing a probable future economic benefit or

passing that it has been suggested that the tort should be recast *solely* in terms of the common law's policy of freedom of competition. (See Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law, supra,* 77 Minn. L.Rev. at pp. 1137-1152; but see *id.* at p. 1140 [recognizing that "tortious interference law is also designed to protect the security and integrity of business relationships"].) If such were to be done, a certain simplicity might be obtained—but only at a cost to other values. Moreover, competition is not a thing unto itself. Rather, it "operates within a framework defined by the general law and by social conventions." (1 Areeda & Turner, Antitrust Law, *supra,* ¶ 107, p. 16.) Thus, the simplicity obtained would not, in fact, be simple.

Another question that should remain open is the precise intent that the tort requires. The "definition of 'intent' continues to be disputed." (Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Contract and Tort Doctrine, supra,* 49 U. Chi. L.Rev. at p. 65; compare, e.g., Rest.2d Torts, § 766B, com. d, p. 22 [intent to act with actual or constructive knowledge of resulting interference] with *Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 827 [intent to interfere] and *DeVoto* v. *Pacific Fid. Life Ins. Co.* (9th Cir. 1980) 618 F.2d 1340, 1348-1349 (per Kennedy, J., applying Cal. law) [intent to harm through interference (*semble*)].) Substantial analysis, however, is needed before an answer may be given.

[13]It has been argued that to impose on the interfered-with party the burden of proving the interfering party's intentional interference with prospective economic advantage *by independently tortious means* "would effectively abolish the interference tort[]," at least pro tanto, because anyone "who could meet this burden could proceed under the independent action and would have no need for the interference tort." (Dowling, *A Contract Theory for a Complex Tort: Limiting Interference With Contract Beyond the Unlawful Means Test, supra,* 40 U. Miami L.Rev. at p. 511, fn. 186.) That is not the case. An interfered-with party may be unable to proceed under such an "independent action" when the means in question are independently tortious *only as to a third party.*

advantage to" Della Penna; (2) Toyota "knew of the existence of the relationship"; (3) Toyota "intentionally engaged in wrongful acts or conduct designed to interfere with or disrupt the relationship"; (4) the "economic relationship was actually interfered with or disrupted"; and (5) the "acts of" Toyota "caused damage to" Della Penna. As to the third element, it further instructed: "Conduct is wrongful if it is outside the realm of legitimate business transactions. . . . Wrongfulness may lie in the method used or by virtue of an improper motive." Della Penna had objected, without success, to the requirement of "wrongfulness." He had then successfully requested the quoted definition as most favorable to his position. The jury subsequently returned an adverse verdict. The superior court rendered judgment accordingly.

On appeal, Della Penna contended, inter alia, that the instructions were prejudicially erroneous because they required "wrongfulness." The Court of Appeal agreed, and reversed.

Under the tort as reformulated, it is plain that the Court of Appeal erred. To be sure, the instructions appear erroneous. They did not expressly require objective, and unlawful, conduct or consequences. Neither, it seems, did they do so impliedly. Any error, however, was not prejudicial. The reason is manifest. To the extent that they were satisfied by mere "wrongfulness"— which, *at Della Penna's request*, was defined under a kind of " 'business ethics' standard" as behavior "outside the realm of legitimate business transactions" because of "method" or "motive"—they were satisfied by far too little. For to that extent they did not demand the use of independently tortious means or restraints of trade. It is true that their focus on motive— "[w]rongfulness may lie . . . by virtue of an improper motive"—might threaten an arbitrary and capricious outcome in a given case. The same is true of their use of the term "wrongful" and its cognates, which are inherently ambiguous (see Note, *The Prima Facie Tort Doctrine, supra*, 52 Colum. L.Rev. at p. 503). But, in spite of the foregoing, there is simply no basis to conclude that the outcome here was either arbitrary or capricious.

## IV

It is evident in the analysis presented above that, on many points, I agree with the majority's discussion of the tort of intentional interference with prospective economic advantage and Della Penna's claim against Toyota asserting such a cause of action.

On two major points, however, I am compelled to state my disagreement.

First, I would not adopt the "standard" of "wrongfulness." As I have noted, the term and its cognates are inherently ambiguous. They should probably be avoided. They should surely not be embraced. That is the course we followed in *Buckaloo*. It should be followed here as well.

Second, if I were to adopt such a "standard," I would not allow it to remain undefined. Otherwise, our effort in *Buckaloo* to rationalize the governing principles would be undermined. Formerly, the interfering party as defendant was left "knowing he was entitled to some defense, but not knowing what defenses would be accounted sufficient." (Dobbs, *Tortious Interference With Contractual Relationships, supra,* 34 Ark. L.Rev. at p. 345.) Now, it appears, the interfered-with party as plaintiff will find himself in a similar position, knowing he may assert a claim, but not knowing the substance of a crucial element. This is hardly an improvement. Any definition of the "standard," of course, should avoid suggesting that the interfering party's motive might be material for present purposes. As I have explained, the focus on this issue is inappropriate. (See, *ante,* at pp. 402-406.) A position of this sort, one must acknowledge, would result in the imposition of no liability on a person who is purely, *but merely,* "malicious"—who acts, to quote Justice Holmes, with "disinterested malevolence" (*Amer. Bank & Trust Co.* v. *Federal Bank* (1921) 256 U.S. 350, 358 [65 L.Ed. 983, 990, 41 S.Ct. 499, 25 A.L.R. 971]). Although such a person might be held responsible in conscience, he should not be made answerable in tort. To reiterate: "The law has no roving commission to root out bad people or people whose minds may harbor bad thoughts." (Dobbs, *Tortious Interference With Contractual Relationships, supra,* 34 Ark. L.Rev. at pp. 347-348.) Even if it did, "problems [are] inherent in proving motivation . . . ." (*Leigh Furniture and Carpet Co.* v. *Isom, supra,* 657 P.2d at p. 307.) In view of such "problems," it has been opined that it would be "prudent for commercial conduct to be regulated *for the most part*" by a consideration of objectively bad conduct and consequences. (*Ibid.,* italics added.) To my mind, it would be even more prudent to omit the italicized qualification.[14]

## V

Because I conclude, for the reasons stated above, that we should reverse the judgment of the Court of Appeal insofar as it reverses the judgment of

[14]Of course, to hold that the interfering party's motive is not material for present purposes does not mean that such motive cannot amount to relevant evidence, that is, "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

the superior court in favor of Toyota and against Della Penna on his claim of the tort of intentional interference with prospective economic advantage, I concur in the judgment.