Filed 12/15/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| COAST HEMATOLOGY-ONCOLOGY ASSOCIATES MEDICAL GROUP, INC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> LONG BEACH MEMORIAL MEDICAL CENTER et al., <br><br> Defendants and Respondents. | B297984 <br><br> (Los Angeles County Super. Ct. No. NC061009) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed in part and reversed in part.

Rutan & Tucker, Gerard Mooney and Proud Usahacharoenporn for Plaintiffs and Appellants.

Foley & Lardner, Tami S. Smason and Kathryn A. Shoemaker for Defendants and Respondents.

_____

The trial court granted summary judgment for the defense, reasoning the plaintiff's two purported trade secrets were not secrets at all. The court was right about one secret but not the other. The trial court also granted the defense's request for relief from the plaintiff's claims for tortious interference and unfair competition. We affirm the trial court rulings except as to the one trade secret. We remand on this lone claim.

I

For years, one medical group negotiated to buy another. Eventually the would-be buyer decided just to hire staff from the would-be seller. The disappointed seller sued for misappropriation of trade secrets and related torts.

The would-be seller, now the plaintiff and appellant, is Coast Hematology-Oncology Associates Medical Group, Inc. Coast treats cancer and illnesses of the blood.

Coast sued its would-be buyer: Long Beach Memorial Medical Center.

Memorial was planning a medical facility near Coast's location and inquired in 2011 about buying Coast's entire practice to help staff its new establishment. Coast and Memorial negotiated for years but could not agree on price. Each side blamed the other for being inflexible and unrealistic. Eventually in 2016 Memorial hired some people working for Coast: two physicians, Nilesh Vora and Milan Sheth, and four staff members who were not physicians.

Coast responded by suing Memorial, as well as Memorial's manager John Bishop. Coast also sued entities allied with Memorial, as well as Dr. Vora. Coast now has settled with Vora, who is not a party to this appeal. This disposed of the one claim against Vora alone.

2

Coast's four remaining claims were for misappropriation of trade secrets, intentional interference with prospective economic advantage, tortious interference with contract, and unfair competition in violation of section 17200 of the Business and Professions Code. Coast also sought punitive damages. We recount the specifics of these claims in our analysis. Memorial successfully moved for summary judgment against Coast. In the alternative, Memorial sought summary adjudication of a range of issues. Coast appealed.

## II

We independently review summary judgment rulings. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.) A defendant moving for summary judgment must show the plaintiff cannot establish an element of its cause of action, or that a complete defense destroys the cause. Summary judgment is appropriate where there is no triable issue as to any material fact. It is not a disfavored remedy. (*Oh v. Teachers Ins. & Annuity Assn. of America* (2020) 53 Cal.App.5th 71, 81–82.) To the contrary, summary judgment motions commonly benefit all sides, no matter who wins: the process of summary judgment is more economical than trial, and the ruling usually gives the parties helpful information about the true value of the case, which can facilitate settlement.

## III

In the first count of its complaint, Coast sued Memorial for stealing trade secrets.

## A

The gist of a trade secret claim is (1) a valuable secret (2) you have worked reasonably hard to keep secret (3) that someone obtained through improper means. These elements spring from

3

California's version of the Uniform Trade Secret Act, which our legislature adopted in 1984.  (Civ. Code, § 3426–3426.11, added by Stats. 1984, ch. 1724, § 1.)

To paraphrase this dense Act, a trade secret is something (1) having commercial value from not being generally known and (2) that is the subject of reasonable secrecy measures.  (See Civ. Code, § 3426.1, subds. (d)(1) & (d)(2) ["(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."].)

One can violate this statute by using improper means to get a trade secret.  (See Civ. Code, §§ 3426.3, subd. (a) ["A complainant may recover damages for the actual loss caused by misappropriation."], 3426.1, subd. (b) [" 'Misappropriation' means:  (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:  (A) Used *improper means* to acquire knowledge of the trade secret; or (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:  (i) Derived from or through a person who had utilized *improper means* to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been

4

acquired by accident or mistake."], italics added; 3426.1, subd. (a) ["'*Improper means*' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."], italics added.)

B

Coast claimed two trade secrets relating to medical billing.

One claimed secret is "CPT." CPT is an acronym for "Current Procedural Terminology." This jargon concerns a nationally uniform system of codes for medical billing: what the doctor's office puts on the form when billing for payment to an insurance company, for instance, or to a government payor like Medicare. As Memorial told the trial court, CPT codes are well-known: "You can Google them and find them online." If you do that, a website will tell you, for example, CPT code 00811 is defined throughout the industry as "Colonoscopy done for diagnostic purposes." (CIPROMS Medical Billing, Billing Guidelines Vary for Anesthesia During Screening Colonoscopies <http://www.ciproms.com/2018/09/billing-guidelines-vary-for-anesthesia-during-screening-colonoscopies/> [as of Dec. 7, 2020], archived at < https://perma.cc/WX8L-EWYJ>.)

To avoid jargon, we call this first alleged secret the "medical codes secret."

The second disputed secret is "RVU," which stands for "Relative Value Unit." This signifies a nationally uniform quantitative scale that rates the difficulty of different medical services. A heart transplant, for example, has a higher relative value according to this scale than does an office visit, because the transplant is more of a challenge than the visit. This scale also can be used to measure physician productivity, because it can measure a doctor's output by a method more sophisticated than

5

merely the number of hours spent or patients seen. A doctor who performs two heart transplants a day, for example, has done different work than one who accomplished two office visits in one day, even if the two put in the same number of hours.

We call this secret the "physician productivity secret."

Our analysis yields two conclusions.

First, the supposed medical codes secret is out of the case. A statute required Coast to identify its secrets with reasonable particularity for the litigation, but Coast did not comply with the statute. The trial court was right to dispose of this claim.

Second, as to the physician productivity secret, Coast succeeded in generating a genuine factual dispute here, meaning summary judgment of this claim was wrong. We remand the case for further proceedings on the physician productivity secret.

We explain our conclusions.

1

We start with the medical codes secret. The trial court was right to rule summarily for Memorial on this point because Coast failed to identify this secret with reasonable particularity, as a California statute requires.

Code of Civil Procedure section 2019.210 is the governing statute. It sets out the identification requirement Coast flunked. This statute specifies that, before commencing discovery relating to the trade secret, the party alleging the misappropriation must "*identify*" the trade secret with "*reasonable particularity*." (*Ibid.*, italics added ["In any action alleging the misappropriation of a trade secret under the Uniform Trade Secrets Act (Title 5 (commencing with Section 3426) of Part 1 of Division 4 of the Civil Code), before commencing discovery relating to the trade secret, the party alleging the misappropriation shall *identify* the

6

trade secret with *reasonable particularity* subject to any orders that may be appropriate under Section 3426.5 of the Civil Code."].)

The penalty for failing to make this disclosure is loss of trade secret protection. (*Pixion, Inc. v. PlaceWare, Inc.* (N.D.Cal. 2005) 421 F.Supp.2d 1233, 1240–1242 [applying state law].)

The need for plaintiffs to identify their claimed secret with reasonable particularity flows from the nature of trade secret law. Trade secrets indeed are intellectual *property*, but of a special sort. We explain.

Fundamentally, any *property* right entitles the owner of the property to exclude others. If you own some real property, for instance, you can exclude trespassers from it, because that land is exclusively yours. The same is true with a car, or a bicycle, or any other piece of physical property. You can control what is yours and so you can tell others whether, and how, they can use your things. Property law will back you up if events force you to court. (E.g., *Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245, 258 [the right to exclude is a fundamental aspect of property ownership].)

Physical property can be defined by its physical nature: your car, my bicycle. Real property is the same, measured out in metes and bounds: physical dimensions as measured by physical tools.

By contrast, intellectual property is intangible. One cannot use a yardstick to measure the boundaries of inventions and proprietary information. The law must define these intangible boundaries in different ways, depending on the particular intellectual property right at issue: patent, copyright, trademark, or trade secret.

7

In patent law, the patent *claims* define what the patent holder owns.  The patent office approves and issues the patent.  The claims language in the patent is public, for all to see, spelling out the patented invention.  (See 35 U.S.C. § 112(b) ["The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."]; see *Markman v. Westview Instruments, Inc.* (1996) 517 U.S. 370, 373.)

In copyright law, the *work of authorship* fixed in a tangible medium of expression defines the property you own.  (17 U.S.C. § 102(a) [copyright protection subsists "in original works of authorship fixed in any tangible medium of expression"].)  When Willa Cather published *My Ántonia*, for instance, her novel fixed her work of authorship and marked out her copyright for the world to inspect and admire.  (Compare *Nichols v. Universal Pictures Corp.* (2d Cir. 1930) 45 F.2d 119 (Hand, J.) [examining work of authorship to define its precise property limit] and *Sheldon v. Metro-Goldwyn Pictures Corp.* (2d Cir. 1936) 81 F.2d 49 (Hand, J.) [same].)

Trademark law defines property limits by reference to the *designation of origin* that the owner uses in commerce.  (15 U.S.C. § 1125(a)(1) [people who, in connection with any goods or services, use in commerce any word or symbol or "any false designation of origin" likely to cause confusion are civilly liable].)  This approach guarantees public awareness of what the intellectual property owns:  the buying public learns to associate trademarks like Clorox and Hilton Hotels with a particular origin for the familiar goods or services.  The public comes to rely on the validity of the mark as an assurance of quality and consistency.

A trademark must be used in commerce and thus known by the purchasing public or it is not a trademark at all. (See, e.g., *In re Trade-Mark Cases* (1879) 100 U.S. 82, 94; *Matal v. Tam* (2017) __U.S.__, __ [137 S.Ct. 1744, 1751–1753].)

Trade secrets are completely different. What are the boundaries of what the trade secret owner owns? No physical ruler can measure a secret in inches or yards. You cannot touch a secret. Nor does some public document or public usage demark the boundaries of the trade secret entitlement. Rather, putative trade secret owners *themselves* spell out the boundaries of their property claims, which they typically specify only *in the course of litigation*.

When you define the proposed boundaries of your own property, and when exclusion is valuable, and when litigation is intense, human nature prompts us to ask for more, not less, and to ask for it in a vague and all-encompassing way. Propelled by strong incentives, plaintiffs can write complaints in just that style. Hence the need in trade secret litigation for plaintiffs at some point to identify what they claim with reasonable particularity. Until a plaintiff does so, the opposing party and the court literally may not know what the plaintiff is talking about. (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 43–44 (*Altavion*); *IDX Systems Corp. v. Epic Systems Corp.* (7th Cir. 2002) 285 F.3d 581, 583 ["unless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job"] (*IDX*).)

A California statute lays down when and how this is to happen. Before commencing discovery relating to trade secrets, the party alleging the misappropriation must "*identify*" trade secrets with "*reasonable particularity*." (Code Civ. Proc., §

2019.210, italics added.) This statute merely formalizes a generally necessary step in trade secret litigation. (See *IDX*, *supra*, 285 F.3d at p. 583; 4 Milgrim on Trade Secrets (2000) § 14.02.01[b].)

In this court, Coast admits it did not list its medical codes as secret in its section 2019.210 designation.

In the trial court, Coast designated nine purported secrets, and none was about medical codes:

"1.  Plaintiff's RVU summaries

"2.  Plaintiff's financial statements

"3.  Plaintiff's infusion services data

"4.  Plaintiff's payer mix data

"5.  Plaintiff's staff salary information

"6.  Plaintiff's bank statements

"7.  Plaintiff's income statements

"8.  Plaintiff's balance sheets and reconciliations

"9.  Plaintiff's drug inventories."

Coast wisely abandons its effort, which it pursued in the trial court, of trying to shoehorn this medical codes secret into these nine inapplicable general categories.

This would seem to end the matter in Memorial's favor, as a matter of law. It was proper for the trial court summarily to adjudicate this question of law.

Coast, however, seeks to avoid this conclusion by making this argument: that it "*requested leave* from the trial court *in its summary judgment papers* to amend its trade secret designation to add the [medical codes] methodology, to the extent necessary." (Italics added.) Coast points to a single sentence it wrote on page 18 of its opposition to Memorial's summary judgment motion: "Therefore, even if the Court somehow finds that [Coast's]

10

designation does not cover any of the subject trade secrets, there is good cause to allow [Coast] to amend its designation." This sentence followed Coast's comment that it could not identify this secret earlier because it had not received pertinent discovery from Memorial until recently.

Two independent reasons invalidate Coast's argument. First, Coast's one sentence was too late. Second, this one sentence was not a motion for leave to amend its trade secret identification. We explain.

a

First, Coast waited too long. The defense must know enough about the claimed trade secret to permit the vital process of summary judgment to proceed. A key issue in a trade secret case is whether the trade secret is truly secret, or instead whether it is "generally known." (Civ. Code, § 3426.1, subd. (d)(1).) Neither the defendant nor the court can tackle this issue sensibly without a reasonably particular definition of the putative trade secret. The plaintiff thus must describe its trade secret with enough particularity to separate it " 'from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.' " (*Altavion, supra*, 226 Cal.App.4th at pp. 43–44.) This process " 'enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges.' " (*Id.* at p. 44.)

The defense typically will aim its summary judgment motion at the trade secret identification the plaintiff served under Code of Civil Procedure section 2019.210. But it destroys the utility of the summary judgment procedure for the plaintiff to

11

wait until *after* the defense has filed its summary judgment motion to announce there is a new secret the plaintiff would like to define. The trial court correctly disregarded Coast's belated effort. (See *Cohen v. Kabbalah Centre Internat., Inc.* (2019) 35 Cal.App.5th 13, 18–19.)

Coast suggested that tardy discovery by Memorial justified Coast's delay. In one footnote in its summary judgment opposition brief, Coast claimed Memorial had been slow to produce the discovery that allowed Coast to realize its medical code secret was at issue. But neither in this court nor in the trial court has Coast made a showing of discovery abuse. As far as is apparent from our record, Coast filed no discovery motions, nor did it seek informal discovery assistance from the court.

If the defense's unjustifiably slow discovery indeed *has* created a plight for the plaintiff, the plaintiff must ask the court to continue the summary judgment process to permit it to reorient its trade secret case. (Cf. *Hamilton v. Orange County Sheriff's Dept.* (2017) 8 Cal.App.5th 759, 764–766 [setting forth procedural options].)

What the plaintiff cannot do is to wait until the defense has loosed its arrow at the bullseye, then move the target, and finally claim victory when the defense's arrow misses the mark. (Cf. *Swarmify, Inc. v. Cloudflare, Inc.* (N.D.Cal. May 31, 2018, No. C 17-06957 WHA) 2018 U.S. Dist. LEXIS 91333 at *6 [" 'Experience has shown that it is easy to allege theft of trade secrets with vagueness, then take discovery into the defendants' files, and then cleverly specify what ever happens to be there as having been trade secrets stolen from plaintiff.' "].)

In sum, Coast waited too long to suggest it had a new trade secret it wanted to add to its case.

b

Second, Coast tells us it "requested leave" to identify a new trade secret. This is inaccurate. Coast made no request and made no motion. Instead, in one sentence Coast asserted in its opposition to Memorial's summary judgment motion that the slow pace of discovery had given it "good cause" to amend its trade secret identification statement.

Coast never amended, or moved to amend, its trade secret disclosure. (Cf. *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 51, fn. 16 [plaintiff amended its trade secret identification statement several times before trial]*; Space Data Corp. v. Alphabet Inc.* (N.D.Cal. May 8, 2018, No. 16-cv-03260-BLF (NC)) 2018 WL 10647160 [district court rules on challenge to plaintiff's *fourth* amended disclosure statement].) Nor did Coast make an oral motion to amend its disclosure statement, even though this topic arose repeatedly in oral argument.

One may not make an important motion by adding an indefinite sentence to the middle of a summary judgment opposition. This tactic does not fairly notify the trial court there is some new issue to decide. If you want a trial court to decide something new, you must ask for a decision in clear terms readers—including the trial judge—will recognize as a motion. If the trial court has not mentioned your request in its tentative ruling, then you must use oral argument to make your motion plain. Coast never did.

In short, the trial court was right to grant summary relief to Memorial regarding Coast's medical code secret. This claim is gone from the case.

2

13

Coast's second secret concerned physician productivity. The trial court granted summary judgment against Coast on this claimed secret. The trial court explained its ruling in terms of "relative value units."

This topic is involved, so we give readers a roadmap. First we will explain more about relative value units to make comprehensible our analysis of the trial court ruling. Armed with this information, next we describe how the trial court analysis got off track. Then we plumb Memorial's erroneous efforts to defend this incorrect trial court ruling.

a

To see how the trial court ruling went wrong, we explain more about relative value units.

The record here gives but the merest glimpse into the specialized but well-established and elaborate world of relative value units in the medical profession. We proceed solely on the basis of the limited information in the record. We glean the following.

Relative value units comprise a quantitative method of comparing medical procedures. Coast did not invent the relative value unit system. On the contrary, this system has been in widespread national use for many years.

The relative value unit system is a numerical scale ranking medical procedures according to difficulty and other factors. This system apparently aims to quantify how compensable, for instance, a heart transplant is compared to, say, a routine office visit with a family practice doctor. The American Medical Association has a standing committee charged with updating the relative value unit scale from time to time. This information seems to be crucial to medical billing and reimbursement.

14

Relative value units are useful, not only for medical billing, but also for evaluating physicians' productivity.

We give a hypothetical example to illustrate this point. If Doctor A generated a large number of relative value units last year while Doctors B, C, and D generated fewer, this disparity might suggest A was busier or more productive than B, C, and D. The company employing these doctors might have an obvious interest in those data: Dr. A is in this sense contributing more to the practice, and perhaps warrants more compensation. The practice might decide, for instance, to work hard to keep A happy and thereby to retain this top producer.

This completes our brief journey into the world of relative value units. We now turn to the trial court ruling.

b

Coast claims its secret is not the relative value unit scale or method itself, but rather the performance of its staff in 2014 and 2015 as measured in relative value units.

The trial court ruled against Coast for two reasons: (1) relative value unit data are not trade secrets because relative value units are a standard professional metric, and (2) these data are not trade secrets because they are personal to each physician.

Both reasons are mistaken.

First, relative value units indeed are a standard metric. But firms can use a standard metric to generate firm-specific information that trade secret law will protect.

People use standard and well-known methods to generate individualized and confidential data all the time. The bathroom scale is commonplace but no one knows your exact weight today—unless you tell them. Putting your finger on your pulse and looking at a clock is the familiar way to figure your heart

15

rate, but others do not know your heart rate at this moment—unless you reveal it. Thermometers are nothing new, but that does not mean everyone knows your body temperatures over the last year—or the temperatures of everyone in your workplace. The billable hour method of measuring lawyers' efforts is in the public domain, but the number of hours billed last year by each lawyer in a particular law firm is not. And so on.

By the same principle, a medical practice's internal records about its staff physicians' productivity, whether measured in relative value units or otherwise, can be confidential and can qualify for trade secret protection. In principle, these data can satisfy all the statutory requirements. The information can have value by virtue of not being publicly known. (Civ. Code, § 3426.1, subd. (d)(1) ["Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use"].) And the firm can take reasonable measures to keep this information secret. (See *id.*, subd. (d)(2) ["the subject of efforts that are reasonable under the circumstances to maintain its secrecy"].)

It thus was error to rule categorically that firm-specific productivity data cannot be a trade secret simply because the firm used a well-known method to generate the data.

Second, it was also error to disqualify productivity data because they are "personal" to individuals. The trial court suggested people have a right to tell a prospective employer their own current salary. But Coast's case is not about that. It is about whether Coast's stockpile of 2014 and 2015 firm-wide productivity records can qualify for trade secret protection. By law, it can. (Cf. *Whyte v. Schlage Lock Co.* (2002) 101

16

Cal.App.4th 1443, 1455 [pricing, cost, and marketing information can be trade secrets].)

c

Memorial makes six efforts to defend the mistaken trial court ruling about Coast's productivity secret. None succeeds.

i

First, Memorial maintains Coast's claim about its productivity secret fails for the same reason as its medical code secret, again citing the California statute that required Coast to identify its secret with reasonable particularity. This argument is incorrect, however, because Coast's first entry on its trade secret was "Plaintiff's RVU summaries." Memorial criticizes these words, saying Coast should have written "RVU analyses and data." There is little practical difference, however, between calling something "summaries" as opposed to "analyses" or "data": all three quoted words are broad terms with potentially overlapping meanings.

If Memorial believed Coast's filing was deficient, it should have moved the trial court to that effect. (E.g., *Alta Devices, Inc. v. LG Electronics, Inc.* (N.D.Cal. Jan. 10, 2019, No. 18-cv-00404-LHK (VKD)) 2019 U.S. Dist. LEXIS 5048 [granting motion to compel more particular trade secrets identification].)

This first argument thus falls short.

ii

Second, Memorial claims Coast offered no evidence to show its productivity data gained value from not being generally known. This is not so. Coast offered evidence to support the secrecy value of its physician productivity data. Memorial's manager retained a consultant who wrote a report that, as part of an effort to set a fair market value for Coast, analyzed relative

17

value unit data.  The reasonable inference is Memorial's consultant thought the physician productivity data were valuable.  (See *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1522 [information can have economic value because its disclosure would allow a competitor to direct efforts at especially promising prospects] (*Morlife*).)  This evidence created a factual dispute for a fact finder.

Memorial attacks this evidence as hearsay but provides us no citation showing it raised this objection in the trial court.  Memorial thus has forfeited this objection, as well as other evidentiary objections it belatedly raises about this document.

iii

Third, Memorial argues the physician productivity data cannot be a trade secret because these data "are not developed by a business."  Whether Coast developed data about the productivity of its physicians is a fact question; some evidence suggests it did, and Memorial seems to offer no evidence to the contrary.  This argument by Memorial is not persuasive.

Memorial also argues physician productivity data cannot be trade secrets because they are too "simple" and too easy to create using well-known industry formulas.  We avoid the implicit legal question by noting Coast offered evidence this calculation method is complicated:  there was a factual dispute even if we assume Memorial's view of the law is correct.

iv

Fourth, Memorial claims Coast did not take adequate measures to preserve secrecy.  But Coast required its staff to sign nondisclosure agreements.  Coast protected computer files with passwords.  It limited access to sensitive materials to a need-to-know basis.  It locked office doors and file cabinets.  Its employee

18

handbook outlined confidentiality duties.  Employees had to acknowledge this material in writing.  This evidence created a factual dispute about secrecy protection.  (See *Morlife*, *supra*, 56 Cal.App.4th at pp. 1521–1523.)

v

Fifth, Memorial notes no case law says physician productivity data can get trade secret protection.  Neither party identifies a case considering this question.  But there are lots of business secrets that have not been the subject of trade secret cases, either because there has not been a dispute on that topic or because the information is a new innovation.  Because these data meet the statutory criteria, at least in principle, they do indeed qualify as trade secrets.  Coast's evidence raised disputed factual issues on these criteria, which mandated defeat of Memorial's motion on this point.

vi

Sixth, Memorial says there is no evidence it misappropriated Coast's secrets.  But Coast asserts Memorial wrongfully violated the confidentiality agreements Coast had with its physicians and with the evaluators Memorial hired to appraise the fair market value of Coast.  Coast's founder testified he had a similar confidentiality agreement directly with Memorial, which Memorial also violated.  Memorial disputes these asserted violations.  This created issues for a fact finder.

In sum, it was wrong to grant summary judgment about the productivity secret.  We remand this claim for further proceedings on this secret.

IV

In the second and third counts in its complaint, Coast sued Memorial for the two types of tortious interference with economic

19

relations. One count was tortious interference with *contract*. Another was interference with *prospective economic advantage*. Via these counts, Coast sought compensation for the interference to the economic relationships it enjoyed with doctors Vora and Sheth, who had departed its payroll and had gone to work at Memorial. But Vora and Sheth were both at-will employees: by contract, they were free to leave at any time, provided they gave proper notice. (There is no dispute on this point: their departure notices were proper.)

Citing the case of *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392–393 (*Della Penna*), the trial court summarily disposed of both of Coast's interference claims, reasoning that Coast offered no proof Memorial had engaged in wrongful conduct.

*Della Penna* was a landmark case because it extensively surveyed 150 years of case law and expressly reconstructed this area of tort doctrine. (*Della Penna*, *supra*, 11 Cal.4th at p. 387–391.) Very recently our Supreme Court reaffirmed and extended this reconstruction. (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1141–1142 (*Ixchel*).)

The trial court's ruling was correct. We affirm it.

## A

We begin with legal background about the torts of interference with contract and interference with prospective economic advantage.

These two interference torts are related but distinct. Interference with contractual relations requires a valid contract between the plaintiff and a third party, while interference with prospective economic advantage does not. (*Ixchel*, *supra*, 9 Cal.5th at p. 1141.)

The roots of these torts go deep into the past, and over the years courts have labored to define the doctrines in clear and sensible ways.  (E.g., *Della Penna, supra,* 11 Cal.4th at p. 378 [review granted to "reexamine" interference tort "in light of divergent rulings from the Court of Appeal and a doctrinal evolution among other state high courts"]; Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine* (1982) 49 U.Chi. L.Rev. 61, 64 ["Despite this long history, doctrinal confusion is pervasive, both within and among jurisdictions."] (hereafter Perlman).)

The common law has shaped both torts with an eye to preserving valid competition in the marketplace.  The premise has been that "ours is a culture firmly wedded to the social rewards of commercial contests, [so] the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties." (*Della Penna, supra,* 11 Cal.4th at p. 392.)  This premise is conventional:  competition can benefit both consumers and employees.  Consumers like low prices and varied choices, while employees like the freedom to leave one job for a better one.

A lurking problem, however, has been that the interference torts have an *anti*competitive potential.  Courts and commentators have grappled with this anticompetitive potential for many years.  Members of the American Law Institute spoke in 1969 of the "astounding" extent to which efforts in that year to restate the black letter of this law seemed to indict "the whole competitive order of American industry . . . ." (Statement of Professor Carl Auerbach at ALI Proceedings, quoted in Perlman, *supra,* at p. 79, fn. 89, quoted in part in *Della Penna, supra,* 11 Cal.4th at p. 384.)

21

The distinguished and oft-cited Professor Perlman called it "startling" that a "doctrine of this sort is superimposed on an economic order committed to competition." (Perlman, *supra*, at p. 78.)

The anticompetitive potential stems from the disruptive competitive process itself. The process of competition *is* the process of interference. Competition gives consumers freedom to abandon one supplier for another offering a better deal. Competition gives employees the power to quit one job for a competing employer offering better opportunities.

But when consumers or employees switch, the old firm loses. The loser may well see the new firm as having "interfered" with its customer or employee relationships. If the law allows these losers to fight in court instead of in the marketplace, they might decide to file " 'time consuming and expensive lawsuits.' " (*Ixchel*, *supra*, 9 Cal.5th at p. 1142 [quoting *Della Penna, supra*, 11 Cal.4th at p. 384].)

The prospect of time consuming and expensive lawsuits can dull the incentive to compete with vigor. Courts thus have been wary of lawsuits brought by a rival that has lost business or employees and is suing based on conduct regarded by the commercial world as both commonplace and appropriate. (*Ixchel*, *supra*, 9 Cal.5th at p. 1142; see also *id*. at p. 1148 [a competitor's good faith offer that causes a business to withdraw from an at-will contract could subject the competitor to costly litigation; allowing disappointed competitors to state claims for interference with at-will contracts too freely may expose routine and legitimate business competition to litigation].)

The law thus has been careful to draw liability lines to maximize areas of competition unburdened by legal penalties. (*Ixchel*, *supra*, 9 Cal.5th at p. 1142.)

In light of these concerns, the California Supreme Court has laid down a special rule limiting the interference torts in a case like this one, which involves only at-will relationships. Parties to at-will contracts have no legal assurance of future economic relations. An at-will contract may be terminated, by its terms, at the prerogative of a single party, perhaps because that party found a better offer from a competitor. In that event, the other party has no legal claim to the continuation of the relationship. The contracting parties bargained for these terms, knowing of the risk the relationship may end at any time. (*Ixchel*, *supra*, 9 Cal.5th at p. 1148.)

The special rule governing at-will contracts requires the plaintiff to demonstrate the defendant interfered with its at-will relationships "through wrongful means." (*Ixchel*, *supra*, 9 Cal.5th at p. 1162.)

B

Using the "wrongful means" test, the trial court correctly ruled against Coast's interference claims. Coast produced no evidence Memorial used wrongful means to interfere with its at-will relationships with Vora and Sheth.

Preliminarily, we note Vora and Sheth are the only two employees at issue here. Coast's opening brief omits mention of patients and other employees, meaning Coast has forfeited interference claims concerning anyone besides Vora and Sheth.

Memorial did not use wrongful conduct to hire Vora and Sheth. Coast claims Memorial engaged in wrongful conduct when it allegedly stole its trade secret about

23

physician productivity. A fact finder ultimately will determine whether Coast's claim has a basis in fact. But, whatever that finding may be, this trade secret was not the mechanism that made Vora and Sheth decide to leave Coast.

Vora and Sheth left Coast because they did not want to work there anymore. These doctors saw greener pastures working for Coast's competitor Memorial. They wanted out. Coast's effort to chain them to their old jobs is doubly anticompetitive: Coast seeks both to cut off the mobility of its at-will employees and to block a competing employer from giving them more attractive prospects. The law does not permit this restraint of trade.

California law safeguards the rights of employees to quit the old job and to start a new one in competition with their former employer, provided the competition is fairly and legally conducted. (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1149 (*Reeves*).) By the same token, California's public policy also generally supports a competitor's right to offer more pay or better terms to another's employee, so long as the employee is free to leave, as an at-will employee is. As Judge Learned Hand observed, a contrary law " 'would be intolerable, both to such employers as could use the employe[e] more effectively and to such employe[e]s as might receive added pay. It would put an end to any kind of competition.' " (*Id.* at p. 1151, quoting *Triangle Film Corp. v. Artcraft Pictures Corp.* (2d Cir. 1918) 250 F. 981, 982.)

Coast's first and main citation is to the *Reeves* case. This case favors Memorial, not Coast. *Reeves* provides an

illuminating contrast with this case. *Reeves* illustrates the kind of actionable wrongful conduct that does propel at-will employees out the door of the old job. That conduct was different from what happened here.

The at-will employees in *Reeves* were non-lawyer staff members at an immigration law firm. Two lawyers at that firm planned to jump ship and to take the old firm's clients. But the schemers' plan was underhanded and unethical. These lawyers bore a fiduciary duty to the firm, but more than five months before leaving they fomented dissatisfaction among the firm's staff. The lawyers also accessed password-protected databases to get contact information for 2,200 clients and then, shortly before resigning, they deleted these data from the firm's computers. They also erased the firm's file of legal forms. They left abruptly, without notice. Although they had been responsible for over 500 client matters, they left no status reports or list of matters or deadlines. Nor did they cooperate with their old firm on a notice to clients. Instead, they embarked on a campaign to solicit the firm's clients, contacting them by telephone without offering the clients a choice of counsel. They caused the clients, many of whom lacked fluency in English, to believe the lead lawyer at the old firm had died or that his firm had gone out of business. The lawyers designed this plan in part to interfere with and disrupt plaintiffs' relationships with their key at-will employees. Nine employees left. Six of these went to work for the new firm the lawyers started. (*Reeves*, *supra*, 33 Cal.4th at pp. 1145–1146 & 1154–1156.)

In *Reeves*, the staff employees left because malefactors poisoned relations in the old workplace and did their best to scuttle the ship on their way out. The wrongful acts made the departing employees want to leave the sinking ship: the wrongful conduct directly caused the employees to choose to quit.

This case is the opposite of *Reeves*. The trade secret dispute here was not why Vora and Sheth decided to opt out of Coast. Rather, Vora and Sheth properly gave 30 days' notice and left because they believed Memorial offered them superior careers. This was robust competition between Memorial and Coast, not underhanded skullduggery.

The trial court was right to grant Memorial summary relief from Coast's allegation of tortious interference.

V

The trial court correctly granted Memorial summary relief from Coast's fourth cause of action, which was for unfair competition. California's trade secret statute displaces claims for unfair competition based on the same nucleus of facts as a trade secrets claim. (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 958 (*K.C. Multimedia*).)

Coast's unfair competition claim indeed is based on the same nucleus of facts as its trade secret claim. Its opening appellate brief describes its unfair competition theory in terms of trade secrets and loss of Coast's confidential information. This explanation merely repeats the logic of its trade secret claim and so must be governed exclusively by trade secret law. (See *K.C. Multimedia, supra*, 171 Cal.App.4th at pp. 953–962; see generally

26

Lemley, *The Surprising Virtues of Treating Trade Secrets As IP Rights* (2008) 61 Stan.L.Rev. 311, 344–348.)

Coast's sole case citation in this portion of its opening brief is *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, which did not consider the trade secret statute California adopted in 1984.

VI

Coast does not challenge the trial court ruling that disposed of its punitive damages claim.

**DISPOSITION**

We reverse the trial court's summary judgment. We direct the summary adjudication of all claims in respondents' favor, with the exception of appellant's claim in count 1 for misappropriation on the physician productivity secret, which appellant called the "RVU summaries" secret. We remand this single claim for further proceedings. In this split decision, all sides shall bear their own costs on appeal.


WILEY, J.


We concur:



BIGELOW, P. J.



STRATTON, J.

27